(Slip Opinion)  OCTOBER TERM, 2005  1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## VOLVO TRUCKS NORTH AMERICA, INC. *v.* REEDER-SIMCO GMC, INC.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

No. 04–905.   Argued October 31, 2005—Decided January 10, 2006

Reeder-Simco GMC, Inc. (Reeder), an authorized dealer of heavy-duty trucks manufactured by Volvo Trucks North America, Inc. (Volvo), generally sold those trucks through an industry-wide competitive bidding process, whereby the retail customer describes its specific product requirements and invites bids from dealers it selects based on such factors as an existing relationship, geography, and reputation.   Once a Volvo dealer receives the customer's specifications, it requests from Volvo a discount or "concession" off the wholesale price. Volvo decides on a case-by-case basis whether to offer a concession. The dealer then uses its Volvo discount in preparing its bid; it purchases trucks from Volvo only if and when the retail customer accepts its bid.   Reeder was one of many regional Volvo dealers.   Although nothing prohibits a Volvo dealer from bidding outside its territory, Reeder rarely bid against another Volvo dealer.   In the atypical case in which a retail customer solicited a bid from more than one Volvo dealer, Volvo's stated policy was to provide the same price concession to each dealer.   In 1997, after Volvo announced plans to enlarge the size of its dealers' markets and to reduce by almost half the number of its dealers, Reeder learned that Volvo had given another dealer a price concession greater than the discounts Reeder typically received.

Reeder, suspecting it was one of the dealers Volvo sought to eliminate, filed this suit under, *inter alia*, §2 of the Clayton Act, as amended by the Robinson-Patman Act, 15 U. S. C. §13, alleging that its sales and profits declined because Volvo offered other dealers more favorable price concessions.   At trial, Reeder presented evidence of two instances when it bid against another Volvo dealer for a particular sale.   In the first, although Volvo initially offered Reeder a

lower concession, Volvo ultimately matched the concession offered to the competing dealer.  Neither dealer won the bid.  In the second, Volvo initially offered the two dealers the same concession, but increased the other dealer's discount after it, rather than Reeder, was selected.  Reeder dominantly relied on comparisons between concessions it received on four occasions when it bid successfully against non-Volvo dealers (and thus purchased Volvo trucks), with more favorable concessions other successful Volvo dealers received in bidding processes in which Reeder did not participate.  Reeder also compared concessions Volvo offered it on several occasions when it bid unsuccessfully against non-Volvo dealers (and therefore did not purchase Volvo trucks), with more favorable concessions accorded other Volvo dealers who gained contracts on which Reeder did not bid.  Reeder did not look for instances in which it received a larger concession than another Volvo dealer, but acknowledged it was "quite possible" that such instances occurred.  Nor did Reeder offer any statistical analysis revealing whether it was disfavored on average as compared to other dealers.  The jury found a reasonable possibility that discriminatory pricing may have harmed competition between Reeder and other Volvo dealers, that Volvo's discriminatory pricing injured Reeder, and that Reeder's damages from Volvo's Robinson-Patman violation exceeded $1.3 million.  The District Court awarded treble damages on the Robinson-Patman Act claim, and entered judgment.

Affirming, the Eighth Circuit, among other things, noted the threshold requirement that Reeder show it was a "purchaser" within the Act's meaning; rejected Volvo's contention that competitive bidding situations do not give rise to Robinson-Patman claims; held that the four instances in which Reeder purchased trucks following successful bids rendered it a purchaser under the Act; determined that a jury could reasonably decide Reeder was in actual competition with favored dealers at the time price differentials were imposed; and held that the jury could properly find Reeder had proved competitive injury based on evidence that (1) Volvo intended to reduce the number of its dealers, (2) Reeder lost one contract for which it competed with another Volvo dealer, (3) Reeder would have earned more profits, had it received the concessions given other dealers, and (4) Reeder's sales declined over time.

*Held:* A manufacturer may not be held liable for secondary-line price discrimination under the Robinson-Patman Act in the absence of a showing that the manufacturer discriminated between dealers competing to resell its product to the same retail customer.  The Act does not reach the case Reeder presents.  It centrally addresses price discrimination in cases involving competition between different purchasers for resale of the purchased product.  Competition of that

Syllabus

character ordinarily is not involved when a product subject to special order is sold through a customer-specific competitive bidding process. Pp. 7–15.

   1. Section 2 was enacted to curb financially powerful corporations' use of localized price-cutting tactics that gravely impaired other sellers' competitive position. *FTC* v. *Anheuser-Busch, Inc.*, 363 U. S. 536, 543, and n. 6. Augmenting §2, the Robinson-Patman Act targeted the perceived harm to competition occasioned by the advent of large chain stores able to obtain lower prices for goods than smaller buyers could demand. Robinson-Patman does not ban all price differences charged to different purchasers of similar commodities, but proscribes only "price discrimination [that] threatens to injure competition," *Brooke Group Ltd.* v. *Brown & Williamson Tobacco Corp.*, 509 U. S. 209, 220. Of the three categories of competitive injury that may give rise to a Robinson-Patman claim, secondary-line cases, like this one, involve price discrimination that injures competition among the discriminating seller's customers (here, Volvo's dealerships). Reeder has satisfied the Act's first two requirements for establishing secondary-line injury: (1) The relevant Volvo truck sales were made in interstate commerce, and (2) the trucks were of "like grade and quality," 15 U. S. C. §13(a). Because Reeder has not identified any differentially-priced transaction in which it was both a "purchaser" under the Act and "in actual competition" with a favored purchaser for the same customer, see *e.g., FTC* v. *Sun Oil Co.*, 371 U. S. 505, 518–519, Volvo and *amicus* United States maintain that Reeder cannot satisfy the Act's third and fourth requirements—that (3) Volvo "discriminate[d] in price between" Reeder and another purchaser of Volvo trucks, and (4) "the effect of such discrimination may be . . . to injure, destroy, or prevent competition" to the advantage of a favored purchaser, *i.e.*, one who "receive[d] the benefit of such discrimination," *ibid*. Absent actual competition with a favored Volvo dealer, Reeder cannot establish the competitive injury the Act requires. Pp. 7–10.

   2. The injury to competition targeted by the Robinson-Patman Act is not established by the selective comparisons Reeder presented at trial: (1) comparisons of concessions Reeder received for four successful bids against *non-Volvo* dealers, with larger concessions other successful Volvo dealers received for *different sales* on which Reeder did not bid (purchase-to-purchase comparisons); (2) comparisons of concessions offered to Reeder in connection with several unsuccessful bids against *non-Volvo* dealers, with greater concessions accorded other Volvo dealers who competed successfully for *different sales* on which Reeder did not bid (offer-to-purchase comparisons); and (3) comparisons of two occasions on which Reeder bid against another

Volvo dealer (head-to-head comparisons).  Pp. 10–14.

(a) Because the purchase-to-purchase and offer-to-purchase comparisons fail to show that Volvo sold at a lower price to Reeder's "competitors," those comparisons do not support an inference of competitive injury.  See *Falls City Industries, Inc.* v. *Vanco Beverage, Inc.,* 460 U. S. 428, 435.  Both types of comparisons fall short because in none of the discrete instances on which Reeder relied did it compete with beneficiaries of the alleged discrimination *for the same customer*.  Nor did Reeder even attempt to show that the compared dealers were consistently favored over it.  Reeder simply paired occasions on which it competed with *non-Volvo* dealers for a sale to Customer A with instances in which other Volvo dealers competed with *non-Volvo* dealers for a sale to Customer B.  The compared incidents were tied to no systematic study and were separated in time by as many as seven months.  This Court declines to permit an inference of competitive injury from evidence of such a mix-and-match, manipulable quality.  No similar risk of manipulation occurs in cases kin to the chain-store paradigm.  Here, there is no discrete "favored" dealer comparable to a chain store or a large independent department store—at least, Reeder's evidence is insufficient to support an inference that such a dealer exists.  For all that appears, Reeder, on occasion, might have gotten a better deal vis-à-vis one or more of the dealers in its comparisons.  While Reeder may have competed with other Volvo dealers for the opportunity to bid on potential sales in a broad geographic area, competition at that initial stage is based on a variety of factors, including the existence *vel non* of a relationship between the potential bidder and the customer, geography, and reputation.  Once the customer has chosen the particular dealers from which it will solicit bids, the relevant market becomes limited to the needs and demands of the particular end user, with only a handful of dealers competing for the sale.  Volvo dealers' bidding for sales in the same geographic area does not import that they in fact competed for the same customer-tailored sales.  Pp. 11–12.

(b) Nor is a Robinson-Patman violation established by Reeder's evidence of two instances in which it competed head to head with another Volvo dealer.  When multiple dealers bid for the business of the *same* customer, only one dealer will win the business and thereafter purchase the supplier's product to fulfill its contractual commitment.  Even assuming the Act applies to head-to-head transactions, Reeder did not establish that it was *disfavored* vis-à-vis other Volvo dealers in the rare instances in which they competed for the same sale—let alone that the alleged discrimination was substantial.  Reeder's evidence showed loss of only one sale to another Volvo dealer, a sale of 12 trucks that would have generated $30,000 in gross profits for

Syllabus

Reeder.  Per its policy, Volvo initially offered Reeder and the other dealer the same concession, but ultimately granted a larger concession to the other dealer after it had won the bid.  In the only other instance of head-to-head competition, Volvo increased Reeder's initial discount to match the discount offered the other competing Volvo dealer, but neither dealer won the bid.  If price discrimination between two purchasers existed at all, it was not of such magnitude as to affect substantially competition between Reeder and the "favored" Volvo dealer.  Pp. 12–13.

　　3. The Robinson-Patman Act signals no large departure from antitrust law's primary concern, interbrand competition.  Even if the Act's text could be construed as Reeder urges and the Eighth Circuit held, this Court would resist interpretation geared more to the protection of existing *competitors* than to the stimulation of *competition*.  There is no evidence here that any favored purchaser possesses market power, the allegedly favored purchasers are dealers with little resemblance to large independent department stores or chain operations, and the supplier's selective price discounting fosters competition among suppliers of different brands.  By declining to extend Robinson-Patman's governance to such cases, the Court continues to construe the Act consistently with antitrust law's broader policies.  Pp. 13–14.

374 F. 3d 701, reversed and remanded.

　　GINSBURG, J., delivered the opinion of the Court, in which ROBERTS, C. J., and O'CONNOR, SCALIA, KENNEDY, SOUTER, and BREYER, JJ., joined.  STEVENS, J., filed a dissenting opinion, in which THOMAS, J., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

No. 04–905

_____

## VOLVO TRUCKS NORTH AMERICA, INC., PETITIONER *v.* REEDER-SIMCO GMC, INC.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

[January 10, 2006]

JUSTICE GINSBURG delivered the opinion of the Court.

This case concerns specially ordered products—heavy-duty trucks supplied by Volvo Trucks North America, Inc. (Volvo), and sold by franchised dealers through a competitive bidding process. In this process, the retail customer states its specifications and invites bids, generally from dealers franchised by different manufacturers. Only when a Volvo dealer's bid proves successful does the dealer arrange to purchase the trucks, which Volvo then builds to meet the customer's specifications.

Reeder-Simco GMC, Inc. (Reeder), a Volvo dealer located in Fort Smith, Arkansas, commenced suit against Volvo alleging that Reeder's sales and profits declined because Volvo offered other dealers more favorable price concessions than those offered to Reeder. Reeder sought redress for its alleged losses under §2 of the Clayton Act, 38 Stat. 730, as amended by the Robinson-Patman Price Discrimination Act, 49 Stat. 1526, 15 U. S. C. §13 (Robinson-Patman Act or Act), and the Arkansas Franchise Practices Act, Ark. Code Ann. §4–72–201 *et seq.* (2001). Reeder prevailed at trial and on appeal on both claims.

We granted review on the federal claim to resolve the question whether a manufacturer offering its dealers different wholesale prices may be held liable for price discrimination proscribed by Robinson-Patman, absent a showing that the manufacturer discriminated between dealers contemporaneously competing to resell to the same retail customer. While state law designed to protect franchisees may provide, and in this case has provided, a remedy for the dealer exposed to conduct of the kind Reeder alleged, the Robinson-Patman Act, we hold, does not reach the case Reeder presents. The Act centrally addresses price discrimination in cases involving competition between different purchasers for resale of the purchased product. Competition of that character ordinarily is not involved when a product subject to special order is sold through a customer-specific competitive bidding process.

I

Volvo manufactures heavy-duty trucks. Reeder sells new and used trucks, including heavy-duty trucks. 374 F. 3d 701, 704 (CA8 2004). Reeder became an authorized dealer of Volvo trucks in 1995, pursuant to a five-year franchise agreement that provided for automatic one-year extensions if Reeder met sales objectives set by Volvo. *Ibid.* Reeder generally sold Volvo's trucks through a competitive bidding process. *Ibid.* In this process, the retail customer describes its specific product requirements and invites bids from several dealers it selects. The customer's "decision to request a bid from a particular dealer or to allow a particular dealer to bid is controlled by such factors as an existing relationship, geography, reputation, and cold calling or other marketing strategies initiated by individual dealers." *Id.*, at 719 (Hansen, J., concurring in part and dissenting in part).

Once a Volvo dealer receives the customer's specifica-

tions, it turns to Volvo and requests a discount or "concession" off the wholesale price (set at 80% of the published retail price). *Id.*, at 704. It is common practice in the industry for manufacturers to offer customer-specific discounts to their dealers. *Ibid.;* App. 334, 337. Volvo decides on a case-by-case basis whether to offer a discount and, if so, what the discount rate will be, taking account of such factors as industry-wide demand and whether the retail customer has, historically, purchased a different brand of trucks. App. 348–349, 333–334.[1] The dealer then uses the discount offered by Volvo in preparing its bid; it purchases trucks from Volvo only if and when the retail customer accepts its bid. *Ibid.*

Reeder was one of many Volvo dealers, each assigned by Volvo to a geographic territory. Reeder's territory encompassed ten counties in Arkansas and two in Oklahoma. 374 F. 3d, at 709. Although nothing prohibits a Volvo dealer from bidding outside its territory, *ibid.,* Reeder rarely bid against another Volvo dealer, see *id.*, at 705; 5 App. in No. 02–2462 (CA8), pp. 1621–1622 (hereinafter C. A. App.). In the atypical event that the same retail customer solicited a bid from more than one Volvo dealer, Volvo's stated policy was to provide the same price concession to each dealer competing head to head for the same sale. 4 C. A. App. 1161–1162; 5 *id.*, at 1619, 1621.

In 1997, Volvo announced a program it called "Volvo Vision," in which the company addressed problems it faced in the market for heavy trucks, among them, the company's assessment that it had too many dealers. Volvo projected enlarging the size of its dealers' markets and reducing the number of dealers from 146 to 75. 374 F. 3d,

---

[1] To shield its ability to compete with other manufacturers, Volvo keeps confidential its precise method for calculating concessions offered to dealers. 374 F. 3d 701, 704–705 (CA8 2004); App. 337–338.

4    VOLVO TRUCKS NORTH AMERICA, INC. *v.* REEDER-
SIMCO GMC, INC.

Opinion of the Court

at 705.   Coincidentally, Reeder learned that Volvo had
given another dealer a price concession greater than the
concessions Reeder typically received, and "Reeder came to
suspect it was one of the dealers Volvo sought to elimi-
nate."  *Ibid.*   Reeder filed suit against Volvo in February
2000, alleging losses attributable to Volvo's violation of the
Arkansas Franchise Practices Act and the Robinson-
Patman Act.

At trial, Reeder's vice-president, William E. Heck, ac-
knowledged that Volvo's policy was to offer equal conces-
sions to Volvo dealers bidding against one another for a
particular contract, but he contended that the policy "was
not executed."  4 C. A. App. 1162.   Reeder presented evi-
dence concerning two instances over the five-year course of
its authorized dealership when Reeder bid against other
Volvo dealers for a particular sale.  374 F. 3d, at 705, 708–
709.   One of the two instances involved Reeder's bid on a
sale to Tommy Davidson Trucking.  4 C. A. App. 1267–
1268.   Volvo initially offered Reeder a concession of 17%,
which Volvo, unprompted, increased to 18.1% and then,
one week later, to 18.9%, to match the concession Volvo
had offered to another of its dealers. 5 *id.*, at 1268–1272.
Neither dealer won the bid.  *Id.*, at 1272.   The other in-
stance involved Hiland Dairy, which solicited bids from
both Reeder and Southwest Missouri Truck Center.  *Id.*, at
1626–1627.   Per its written policy, Volvo offered the two
dealers the same concession, and Hiland selected South-
west Missouri, a dealer from which Hiland had previously
purchased trucks.  *Ibid.*   After selecting Southwest Mis-
souri, Hiland insisted on the price Southwest Missouri had
bid prior to a general increase in Volvo's prices; Volvo
obliged by increasing the size of the discount.  *Id.*, at 1627.
See also *id.*, at 1483–1488; 374 F. 3d, at 720 (Hansen, J.,
concurring in part and dissenting in part).

Reeder dominantly relied on comparisons between
concessions Volvo offered when Reeder bid against non-

Volvo dealers, with concessions accorded to other Volvo dealers similarly bidding against non-Volvo dealers for other sales. Reeder's evidence compared concessions Reeder received on four occasions when it bid successfully against non-Volvo dealers (and thus purchased Volvo trucks), with more favorable concessions other successful Volvo dealers received in connection with bidding processes in which Reeder did not participate. *Id.*, at 705–706. Reeder also compared concessions offered by Volvo on several occasions when Reeder bid unsuccessfully against non-Volvo dealers (and therefore did not purchase Volvo trucks), with more favorable concessions received by other Volvo dealers who gained contracts on which Reeder did not bid. *Id.*, at 706–707.

Reeder's vice-president, Heck, testified that Reeder did not look for instances in which it received a *larger* concession than another Volvo dealer, although he acknowledged it was "quite possible" that such instances occurred. 5 C. A. App. 1462. Nor did Reeder endeavor to determine by any statistical analysis whether Reeder was disfavored on average as compared to another dealer or set of dealers. *Id.*, at 1462–1464.

The jury found that there was a reasonable possibility that discriminatory pricing may have harmed competition between Reeder and other Volvo truck dealers, and that Volvo's discriminatory pricing injured Reeder. App. 480–486. It further found that Reeder's damages from Volvo's Robinson-Patman Act violation exceeded $1.3 million. *Id.*, at 486.[2] The District Court summarily denied Volvo's motion for judgment as a matter of law and the company's alternative motion for new trial or remittitur, awarded

--------

[2] The jury also awarded Reeder damages of $513,750 on Reeder's state-law claim under the Arkansas Franchise Practices Act. No question is before us respecting that claim, which trained on Volvo's alleged design to eliminate Reeder as a Volvo dealer. See *supra*, at 4.

6    VOLVO TRUCKS NORTH AMERICA, INC. *v.* REEDER-
SIMCO  GMC, INC.

Opinion of the Court

treble damages on the Robinson-Patman Act claim, and
entered judgment.

A divided Court of Appeals for the Eighth Circuit af-
firmed.  The appeals court noted that, "as a threshold
matter[,] Reeder had to show [that] it was a 'purchaser'
within the meaning of the [Act]," 374 F. 3d, at 708, *i.e.*,
that "there were actual sales at two different prices[,] . . . a
sale to [Reeder] and a sale to another Volvo dealer," *id.*, at
707–708.  Rejecting Volvo's contention that competitive
bidding situations do not give rise to claims under the
Robinson-Patman Act, *id.*, at 708–709, the Court of Ap-
peals observed that Reeder was "more than an unsuccess-
ful bidder," *id.*, at 709.  The four instances in which
Reeder "actually purchased Volvo trucks following suc-
cessful bids on contracts," the court concluded, sufficed to
render Reeder a purchaser within the meaning of the Act.
*Ibid.*

The Court of Appeals next determined that a jury could
reasonably decide that Reeder was "in actual competition"
with favored dealers.  *Ibid.*  "[A]s of the time the price
differential was imposed," the court reasoned, "the favored
and disfavored purchasers competed at the same func-
tional level . . . and within the same geographic market."
*Ibid.* (quoting *Best Brands Beverage, Inc.* v. *Falstaff Brew-
ing Corp.*, 842 F. 2d 578, 585 (CA2 1987)).  The court
further held that the jury could properly find from the
evidence that Reeder had proved competitive injury from
price discrimination.  Specifically, the court pointed to
evidence showing that (1) Volvo intended to reduce the
number of its dealers; (2) Reeder lost the Hiland Dairy
contract, for which it competed head to head with another
Volvo dealer; (3) Reeder would have earned more profits,
had it received the concessions other dealers received; and
(4) Reeder's sales had declined over a period of time.  374
F. 3d, at 711–712.  The court also affirmed the award of
treble damages to Reeder.  *Id.*, at 712–714.

Judge Hansen dissented as to the Robinson-Patman Act claim. "Traditional [Robinson-Patman Act] cases," he observed, "involve sellers and purchasers that carry inventory or deal in fungible goods." *Id.*, at 718. The majority, Judge Hansen commented, "attempt[ed] to fit a square peg into a round hole," *ibid.,* when it extended the Act's reach to the marketplace for heavy-duty trucks, where "special-order products are sold to individual, pre-identified customers only after competitive bidding," *ibid.* There may be competition among dealers for the opportunity to bid on potential sales, he noted, but "[o]nce bidding begins, . . . the relevant market becomes limited to the needs and demands of a particular end user, with only a handful of dealers competing for the ultimate sale." *Id.*, at 719. Violation of the Act, in Judge Hansen's view, could not be predicated on the instances Reeder identified in which it was a purchaser, for "there was no actual competition between" Reeder and another Volvo dealer at the time of Reeder's purchases. *Ibid.* "Without proof of actual competition" for the same customer when the requisite purchases were made, he concluded, "Reeder cannot demonstrate a reasonable possibility of competitive injury." *Ibid.*

We granted certiorari, 544 U. S. \_\_\_ (2005), to resolve this question: May a manufacturer be held liable for secondary-line price discrimination under the Robinson-Patman Act in the absence of a showing that the manufacturer discriminated between dealers competing to resell its product to the same retail customer? Satisfied that the Court of Appeals erred in answering that question in the affirmative, we reverse the Eighth Circuit's judgment.

## II

Section 2, "when originally enacted as part of the Clayton Act in 1914, was born of a desire by Congress to curb the use by financially powerful corporations of localized price-cutting tactics which had gravely impaired the com-

8    VOLVO TRUCKS NORTH AMERICA, INC. *v.* REEDER-
SIMCO GMC, INC.

Opinion of the Court

petitive position of other sellers." *FTC* v. *Anheuser-Busch, Inc.*, 363 U. S. 536, 543, and n. 6 (1960) (citing H. R. Rep. No. 627, 63d Cong., 2d Sess., 8 (1914); S. Rep. No. 698, 63d Cong., 2d Sess., 2–4 (1914)).  Augmenting that provision in 1936 with the Robinson-Patman Act, Congress sought to target the perceived harm to competition occasioned by powerful buyers, rather than sellers; specifically, Congress responded to the advent of large chain stores, enterprises with the clout to obtain lower prices for goods than smaller buyers could demand.  See 14 H. Hovenkamp, Antitrust Law ¶2302, p. 11 (2d ed. 2006) (hereinafter Hovenkamp); P. Areeda & L. Kaplow, Antitrust Analysis ¶602, pp. 908–909 (5th ed. 1997) (hereinafter Areeda).  The Act provides, in relevant part:

> "It shall be unlawful for any person engaged in commerce . . . to discriminate in price between different purchasers of commodities of like grade and quality, . . . where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them . . . ."  15 U. S. C. §13(a).

Pursuant to §4 of the Clayton Act, a private plaintiff may recover threefold for actual injury sustained as a result of a violation of the Robinson-Patman Act.  See 15 U. S. C. §15(a); *J. Truett Payne Co.* v. *Chrysler Motors Corp.*, 451 U. S. 557, 562 (1981).

Mindful of the purposes of the Act and of the antitrust laws generally, we have explained that Robinson-Patman does not "ban all price differences charged to different purchasers of commodities of like grade and quality," *Brooke Group Ltd.* v. *Brown & Williamson Tobacco Corp.*,

509 U. S. 209, 220 (1993) (internal quotation marks omitted); rather, the Act proscribes "price discrimination only to the extent that it threatens to injure competition," *ibid.* Our decisions describe three categories of competitive injury that may give rise to a Robinson-Patman Act claim: primary-line, secondary-line, and tertiary-line. Primary-line cases entail conduct—most conspicuously, predatory pricing—that injures competition at the level of the discriminating seller and its direct competitors. See, *e.g.*, *id.*, at 220–222; see also Hovenkamp ¶2301a, pp. 4–6. Secondary-line cases, of which this is one, involve price discrimination that injures competition among the discriminating seller's customers (here, Volvo's dealerships); cases in this category typically refer to "favored" and "disfavored" purchasers. See *ibid.; Texaco Inc.* v. *Hasbrouck*, 496 U. S. 543, 558, n. 15 (1990). Tertiary-line cases involve injury to competition at the level of the purchaser's customers. See Areeda ¶601e, p. 907.

To establish the secondary-line injury of which it complains, Reeder had to show that (1) the relevant Volvo truck sales were made in interstate commerce; (2) the trucks were of "like grade and quality"; (3) Volvo "discriminate[d] in price between" Reeder and another purchaser of Volvo trucks; and (4) "the effect of such discrimination may be . . . to injure, destroy, or prevent competition" to the advantage of a favored purchaser, *i.e.*, one who "receive[d] the benefit of such discrimination." 15 U. S. C. §13(a). It is undisputed that Reeder has satisfied the first and second requirements. Volvo and the United States, as *amicus curiae*, maintain that Reeder cannot satisfy the third and fourth requirements, because Reeder has not identified any differentially-priced transaction in which it was both a "purchaser" under the Act and "in actual competition" with a favored purchaser for the same customer.

A hallmark of the requisite competitive injury, our

10     VOLVO TRUCKS NORTH AMERICA, INC. *v.* REEDER-
SIMCO GMC, INC.

Opinion of the Court

decisions indicate, is the diversion of sales or profits from a disfavored purchaser to a favored purchaser. *FTC* v. *Sun Oil Co.*, 371 U. S. 505, 518–519 (1963) (evidence showed patronage shifted from disfavored dealers to favored dealers); *Falls City Industries, Inc.* v. *Vanco Beverage, Inc.*, 460 U. S. 428, 437–438, and n. 8 (1983) (complaint "supported by direct evidence of diverted sales"). We have also recognized that a permissible inference of competitive injury may arise from evidence that a favored competitor received a significant price reduction over a substantial period of time. See *FTC* v. *Morton Salt Co.*, 334 U. S. 37, 49–51 (1948); *Falls City Industries*, 460 U. S., at 435. Absent actual competition with a favored Volvo dealer, however, Reeder cannot establish the competitive injury required under the Act.

## III

The evidence Reeder offered at trial falls into three categories: (1) comparisons of concessions Reeder received for four successful bids against *non-Volvo* dealers, with larger concessions other successful Volvo dealers received for *different sales* on which Reeder did not bid (purchase-to-purchase comparisons); (2) comparisons of concessions offered to Reeder in connection with several unsuccessful bids against *non-Volvo* dealers, with greater concessions accorded other Volvo dealers who competed successfully for *different sales* on which Reeder did not bid (offer-to-purchase comparisons); and (3) evidence of two occasions on which Reeder bid against another Volvo dealer (head-to-head comparisons). The Court of Appeals concluded that Reeder demonstrated competitive injury under the Act because Reeder competed with favored purchasers "at the same functional level . . . and within the same geographic market." 374 F. 3d, at 709 (quoting *Best Brands*, 842 F. 2d, at 585). As we see it, however, selective comparisons of the kind Reeder presented do not show the

injury to competition targeted by the Robinson-Patman Act.

## A

Both the purchase-to-purchase and the offer-to-purchase comparisons fall short, for in none of the discrete instances on which Reeder relied did Reeder compete with beneficiaries of the alleged discrimination *for the same customer*. Nor did Reeder even attempt to show that the compared dealers were consistently favored vis-à-vis Reeder. Reeder simply paired occasions on which it competed with *non-Volvo* dealers for a sale to Customer A with instances in which other Volvo dealers competed with *non-Volvo* dealers for a sale to Customer B. The compared incidents were tied to no systematic study and were separated in time by as many as seven months. See 374 F. 3d, at 706, 710.

We decline to permit an inference of competitive injury from evidence of such a mix-and-match, manipulable quality. See Tr. of Oral Arg. 34–35, 55. No similar risk of manipulation occurs in cases kin to the chain-store paradigm. Here, there is no discrete "favored" dealer comparable to a chain store or a large independent department store—at least, Reeder's evidence is insufficient to support an inference of such a dealer or set of dealers. For all we know, Reeder, on occasion, might have gotten a better deal vis-à-vis one or more of the dealers in its comparisons. See *supra*, at 5.

Reeder may have competed with other Volvo dealers for the opportunity to bid on potential sales in a broad geographic area. At that initial stage, however, competition is not affected by differential pricing; a dealer in the competitive bidding process here at issue approaches Volvo for a price concession only after it has been selected by a retail customer to submit a bid. Competition for an opportunity to bid, we earlier observed, is based on a variety of

factors, including the existence *vel non* of a relationship between the potential bidder and the customer, geography, and reputation.  See *supra*, at 2.[3]  We reiterate in this regard an observation made by Judge Hansen, dissenting from the Eighth Circuit's Robinson-Patman holding: Once a retail customer has chosen the particular dealers from which it will solicit bids, "the relevant market becomes limited to the needs and demands of a particular end user, with only a handful of dealers competing for the ultimate sale."  374 F. 3d, at 719.  That Volvo dealers may bid for sales in the same geographic area does not import that they in fact competed for the same customer-tailored sales. In sum, the purchase-to-purchase and offer-to-purchase comparisons fail to show that Volvo sold at a lower price to Reeder's "competitors," hence those comparisons do not support an inference of competitive injury.  See *Falls City Industries*, 460 U. S., at 435 (inference of competitive injury under *Morton Salt* arises from "proof of a substantial price discrimination between *competing purchasers* over time" (emphasis added)).

## B

Reeder did offer evidence of two instances in which it competed head to head with another Volvo dealer.  See *supra*, at 4.  When multiple dealers bid for the business of the *same* customer, only one dealer will win the business and thereafter purchase the supplier's product to fulfill its contractual commitment.    Because  Robinson-Patman "prohibits only discrimination 'between different *purchas-*

---

[3]A dealer's reputation for securing favorable concessions, we recognize, may influence the customer's bidding invitations.  Cf. *post*, at 3, n. 2.  We do not pursue that point here, however, because Reeder did not present—or even look for—evidence that Volvo consistently disfavored Reeder while it consistently favored certain other dealers.  See *supra*, at 5.

*ers*,'" Brief for Petitioner 26 (quoting 15 U. S. C. §13(a); emphasis added), Volvo and the United States argue, the Act does not reach markets characterized by competitive bidding and special-order sales, as opposed to sales from inventory.    See Brief for Petitioner 27; Brief for United States as *Amicus Curiae* 9, 17–20.  We need not decide that question today.  Assuming the Act applies to the head-to-head transactions, Reeder did not establish that it was *disfavored* vis-à-vis other Volvo dealers in the rare instances in which they competed for the same sale— let alone that the alleged discrimination was substantial. See 1 ABA Section of Antitrust Law, Antitrust Law Developments 478–479 (5th ed. 2002) ("No inference of injury to competition is permitted when the discrimination is not substantial." (collecting cases)).

Reeder's evidence showed loss of only one sale to another Volvo dealer, a sale of 12 trucks that would have generated $30,000 in gross profits for Reeder.  374 F. 3d, at 705.  Per its policy, Volvo initially offered Reeder and the other dealer the same concession.  Volvo ultimately granted a larger concession to the other dealer, but only after it had won the bid.  In the only other instance of head-to-head competition Reeder identified, Volvo increased Reeder's initial 17% discount to 18.9%, to match the discount offered to the other competing Volvo dealer; neither dealer won the bid.  See *supra*, at 4.  In short, if price discrimination between two purchasers existed at all, it was not of such magnitude as to affect substantially competition between Reeder and the "favored" Volvo dealer.

## IV

Interbrand competition, our opinions affirm, is the "primary concern of antitrust law."  *Continental T. V., Inc.* v. *GTE Sylvania, Inc.*, 433 U. S. 36, 51–52, n. 19 (1977). The Robinson-Patman Act signals no large departure from

that main concern. Even if the Act's text could be con-
strued in the manner urged by Reeder and embraced by
the Court of Appeals, we would resist interpretation
geared more to the protection of existing *competitors* than
to the stimulation of *competition*.[4] In the case before us,
there is no evidence that any favored purchaser possesses
market power, the allegedly favored purchasers are deal-
ers with little resemblance to large independent depart-
ment stores or chain operations, and the supplier's selec-
tive price discounting fosters competition among suppliers
of different brands. See *id.,* at 51–52 (observing that the
market impact of a vertical practice, such as a change in a
supplier's distribution system, may be a "simultaneous
reduction of intrabrand competition and stimulation of
interbrand competition"). By declining to extend Robin-
son-Patman's governance to such cases, we continue to
construe the Act "consistently with broader policies of the
antitrust laws." *Brooke Group*, 509 U. S., at 220 (quoting
*Great Atlantic & Pacific Tea Co.* v. *FTC*, 440 U. S. 69, 80,
n. 13 (1979)); see *Automatic Canteen Co. of America* v.
*FTC*, 346 U. S. 61, 63 (1953) (cautioning against Robinson-
Patman constructions that "extend beyond the prohibi-
tions of the Act and, in doing so, help give rise to a price
uniformity and rigidity in open conflict with the purposes
of other antitrust legislation").[5]

---

[4] The dissent assails Volvo's decision to reduce the number of its deal-
ers. *Post*, at 2, 5. But Robinson-Patman does not bar a manufacturer
from restructuring its distribution networks to improve the efficiency of
its operations. If Volvo did not honor its obligations to Reeder as its
franchisee, "[a]ny remedy . . . lies in state laws addressing unfair
competition and the rights of franchisees, not in the Robinson-Patman
Act." Brief for United States as *Amicus Curiae* 28.

[5] See also 14 H. Hovenkamp, Antitrust Law ¶2333c, p. 109 (2d ed.
2006) (commenting that the Eighth Circuit's expansive interpretation
"views the [Robinson-Patman Act] as a guarantee of equal profit
margins on sales actually made," and thereby exposes manufacturers to
treble damages unless they "charge uniform prices to their dealers").

Opinion of the Court

\*    \*    \*

For the reasons stated, the judgment of the Court of Appeals for the Eighth Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

―――――――

No. 04–905

―――――――

## VOLVO TRUCKS NORTH AMERICA, INC., PETITIONER *v.* REEDER-SIMCO GMC, INC.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE EIGHTH CIRCUIT

[January 10, 2006]

JUSTICE STEVENS, with whom JUSTICE THOMAS joins, dissenting.

Franchised dealers who sell Volvo trucks, like those who sell automobiles, farm equipment, washing machines, and a variety of other expensive items, routinely engage in negotiations with prospective purchasers. Sometimes the prospect is simultaneously negotiating with two Volvo dealers, sometimes with a Volvo dealer and a dealer representing another manufacturer, and still other times a satisfied customer who is generally familiar with the options available in a competitive market may negotiate with only one dealer at a time. Until today, the Robinson-Patman Act's prohibition of price discrimination[1] would have protected the dealer's ability to negotiate in all those situations. Today, however, by adopting a novel, transaction-specific concept of competition, the Court eliminates

―――――――

[1] Section 2 of the Clayton Act, as amended by §1 of the Robinson-Patman Act, provides in relevant part that:

"It shall be unlawful for any person . . . to discriminate in price between different purchasers of commodities of like grade and quality . . . where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them." 38 Stat. 730, as amended, 49 Stat. 1526, 15 U. S. C. §13(a).

2    VOLVO TRUCKS NORTH AMERICA, INC. *v.* REEDER-
SIMCO  GMC, INC.

STEVENS, J., dissenting

that statutory protection in all but those rare situations in which a prospective purchaser is negotiating with two Volvo dealers at the same time.

## I

Setting aside for the moment the fact that the case involves goods specially ordered for particular customers rather than goods stocked in inventory, the case is a rather ordinary Robinson-Patman suit.   Respondent Reeder alleged a violation of the Act; the parties submitted a good deal of conflicting evidence to the jury; the trial judge properly instructed the jurors on the elements of price discrimination, competitive injury, and damages; and the jury returned a verdict resolving all issues in Reeder's favor.   The Court of Appeals found no error in either the instructions or the sufficiency of the evidence. 374 F. 3d 701 (CA8 2004).

Two issues of fact bear particular mention.

First, Volvo does not challenge the jury's finding of price discrimination.   Reeder's theory of the case was that Volvo sought to cut back its number of dealers and deemed Reeder expendable.   To avoid possible violations of franchise agreements and state laws, Volvo chose to accomplish this goal by offering Reeder worse prices than other regional dealers.

Reeder introduced substantial evidence of this theory. It showed that Volvo had an explicit business strategy, known as the "Volvo Vision," of "fewer dealers, larger markets."  App. 34.  It showed that Volvo could afford to lose sales as it squeezed dealers out, since the boom years of the late 1990's left Volvo with about as many orders as it could fill.  *Id.*, at 256–257.  And it showed that Volvo frequently gave worse prices to it than to other regional dealers.  On at least four occasions, Volvo sold trucks to Reeder at significantly higher prices than to other dealers

buying similar trucks around the same time.[2] To give one example, in the spring of 1998 Volvo sold 20 trucks to Reeder at a 9% concession, but sold similar trucks to a Texas dealer at a 12.3% concession. *Id.,* at 132–134. This left Reeder paying $2,606 more per truck. *Id.*, at 134. Although the Court chides Reeder for failing to perform statistical analyses, see *ante*, at 5, 11, the jury clearly had a sufficient basis for finding price discrimination. It could infer that Volvo's pricing policies were comparable to a secret catalog listing one set of low prices for its "A" dealers and a higher set for its "B" dealers like Reeder, with an exception providing for the same prices where an "A" dealer and a "B" dealer were engaged in negotiations with the same customer at the same time.

　Second, the jury found that the favored dealers at issue in these comparisons were competitive players in the same geographic market as Reeder. This conclusion is implicit in the jury's finding of competitive injury, since the jury instruction on that element required Reeder to prove

> "a substantial difference in price in sales by defendant to plaintiff and other competing Volvo dealers over a significant period of time. This requires plaintiff to show that it and the other Volvo dealer(s) were retail dealers within the same geographic market and that the effect of the price differential was to allow the other Volvo dealer(s) to draw sales or profits away from plaintiff." App. 480, Instruction No. 18.

Volvo does not dispute that the evidence was sufficient to support the jury finding that Reeder and the favored

---

　[2] Additionally, on more than 12 other occasions, Volvo offered worse deals to Reeder than it gave to dealers who made comparable purchases. Arguably due to Volvo's stingy concessions, Reeder failed to close with its customers in these instances and thus never ended up buying the trucks at issue from Volvo.

dealers operated in the same geographic market.[3]  Volvo's restraint is wise, as Reeder offered evidence that truck buyers are unsurprisingly mobile, that it delivered trucks to purchasers throughout the region, and that customers would sometimes solicit bids from more than one regional Volvo dealer.

## II

For decades, juries have routinely inferred the requisite injury to competition under the Robinson-Patman Act from the fact that a manufacturer sells goods to one retailer at a higher price than to its competitors.  This rule dates back to the following discussion of competitive injury in Justice Black's opinion for the Court in *FTC* v. *Morton Salt Co.*, 334 U. S. 37 (1948):

> "It is argued that the findings fail to show that respondent's discriminatory discounts had in fact caused injury to competition.  There are specific findings that such injuries had resulted from respondent's discounts, although the statute does not require the Commission to find that injury has actually resulted. The statute requires no more than that the effect of the prohibited price discriminations 'may be substantially to lessen competition . . . or to injure, destroy, or prevent competition.'  After a careful consideration of this provision of the Robinson-Patman Act, we have said that 'the statute does not require that the discriminations must in fact have harmed competition, but only that there is a reasonable possibility that they "may" have such an effect.'  *Corn Products Co.* v. *Federal Trade Comm'n*, 324 U. S. 726, 742.  Here the

_____

[3] Similarly, and despite its selective discussion of the extensive evidentiary record, *ante*, at 2–5, the Court does not question the sufficiency of the evidence supporting the jury's finding that Volvo engaged in price discrimination against Reeder relative to other regional Volvo dealers for a significant period of time.

Commission found what would appear to be obvious, that the competitive opportunities of certain merchants were injured when they had to pay respondent substantially more for their goods than their competitors had to pay. The findings are adequate." *Id.,* at 45–47 (footnote omitted).

We have treated as competitors those who sell "in a single, interstate retail market." *Falls City Industries, Inc.* v. *Vanco Beverage, Inc.,* 460 U. S. 428, 436 (1983); cf. *Tampa Elec. Co.* v. *Nashville Coal Co.,* 365 U. S. 320, 327 (1961). Under this approach—uncontroversial until today—Reeder would readily prevail. There is ample evidence that Volvo charged Reeder higher prices than it charged to competing dealers in the same market over a period of many months. That those higher prices impaired Reeder's ability to compete with those dealers is just as obvious as the injury to competition described by the Court in *Morton Salt*.

Volvo nonetheless argues that no competitive injury could have occurred because it never discriminated against Reeder when Reeder and another Volvo dealer were seeking concessions with regard to the same ultimate customer. In Volvo's view, each transaction was a separate market, one defined by the customer and those dealers whom it had asked for bids. For each specific customer who has solicited bids, Reeder's only "competitors" were the other dealers making bids. Accordingly, if none of these other dealers were Volvo dealers, then Reeder suffered no competitive harm (relative to other Volvo dealers) when Volvo gave it a discriminatorily high price.

Unlike the Court, I cannot accept Volvo's vision. Nothing in the statute or in our precedent suggests that "competition" is evaluated by a transaction-specific inquiry, and such an approach makes little sense. It requires us to ignore the fact that competition among truck dealers is a

continuing war waged over time rather than a series of wholly discrete events. Each time Reeder managed to resell trucks it had purchased at discriminatorily high prices, it was forced either to accept lower profit margins than were available to favored Volvo dealers or to pass on the higher costs to its customers (who then might well go to a different dealer the next time). And we have long indicated that lost profits relative to a competitor are a proper basis for permitting the *Morton Salt* inference. See, *e.g., Falls City Industries,* 460 U. S., at 435 (noting that to overcome the *Morton Salt* inference, a defendant needs "evidence breaking the causal connection between a price differential and lost sales *or profits*" (emphasis added)). By ignoring these commonsense points, the Court gives short shrift to the Robinson-Patman Act's prophylactic intent. See 15 U. S. C. §13(a) (barring price discrimination where "the effect of such discrimination *may* be substantially to lessen competition" (emphasis added)); see also, *e.g., Morton Salt,* 334 U. S., at 46.

The Court appears to hold that, absent head-to-head bidding with a favored dealer, a dealer in a competitive bidding market can suffer no competitive injury.[4] It is unclear whether that holding is limited to franchised dealers who do not maintain inventories, or excludes virtually all franchisees from the effective protection of the Act. In either event, it is not faithful to the statutory text.

---

[4] Indeed, if Volvo's argument about the meaning of "purchaser," see *ante*, at 12–13, ultimately meets with this Court's approval, then the Robinson-Patman Act will simply not apply in the special-order context. Any time a special-order dealer fails to complete a transaction because the high price drives away its ultimate customer, there will be no Robinson-Patman violation because the dealer will not meet the "purchaser" requirement, and any time the dealer completes the transaction but at a discriminatorily high price, there will be no violation because the dealer has no "competition" (as the majority sees it) for that specific transaction at the moment of purchase.

## III

As the Court recognizes, the Robinson-Patman Act was primarily intended to protect small retailers from the vigorous competition afforded by chainstores and other large volume purchasers. Whether that statutory mission represented sound economic policy is not merely the subject of serious debate, but may well merit Judge Bork's characterization as "wholly mistaken economic theory."[5] I do not suggest that disagreement with the policy of the Act has played a conscious role in my colleagues' unprecedented decision today. I cannot avoid, however, identifying the irony in a decision refusing to adhere to the text of the Act in a case in which the jury credited evidence that discriminatory prices were employed as means of escaping contractual commitments and eliminating specifically targeted firms from a competitive market. The exceptional quality of this case provides strong reason to enforce the Act's prohibition against discrimination even if Judge Bork's evaluation (with which I happen to agree) is completely accurate.

Accordingly, I respectfully dissent.

---

[5] R. Bork, The Antitrust Paradox 382 (1978).