NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 07a0162n.06
Filed: February 27, 2007

No. 05-6481

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| SMITH WHOLESALE COMPANY, INC., ANDALUSIA DISTRIBUTING COMPANY, INC., AXTON CANDY & TOBACCO COMPANY, LLC, BUYERS WHOLESALE DISTRIBUTORS, INC., A.B. COKER CO., INC., AFFILIATED FOODS, INC., ASHLAND SPECIALTY, DIXIE TOBACCO & CANDY CO., INC., EBY-BROWN COMPANY, FOREST CITY GROCERY COMPANY, INC., HOME FOLKS WHOLESALE COMPANY, INC., HUNTSVILLE WHOLESALE GROCERY, INDEPENDENT WHOLESALE INC., JACKSON WHOLESALE, LAG, INC., MACON CIGAR & TOBACCO COMPANY, INC., MARKET GROCERY CO., d/b/a/ MODERN GROCERY, MYDAD, LLC, d/b/a HARDEC'S, NOVELART MANUFACTURING CO., INC., d/b/a TOPICZ, PARK CITY TOBACCO, PITTMAN BROTHERS CO., R.C. TAYLOR DISTRIBUTING CO., REIDSVILLE GROCERY COMPANY, INC., RENFRO SUPPLY COMPANY, INC., RICE WHOLESALE COMPANY, INC., ROBERT'S CIGAR & TOBACCO COMPANY, INC., TRIPLE C WHOLESALE, WICHITA TOBACCO & CANDY CO., and CHARLES M. SLEDD COMPANY, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF TENNESSEE |
|        Plaintiffs-Appellants, | ) ) | |
| M-K GROCERY CO. d/b/a BATES DISTRIBUTING CO., | ) ) | |
|        Plaintiff, | ) ) | |
| STATE OF TENNESSEE and STATE OF MISSISSIPPI, | ) ) | |
|        Intervening Plaintiffs,<br>           v. | ) ) ) | |
| PHILIP MORRIS USA, INC., | ) ) | |

_____Defendant-Appellee.                                    )

_____     )


BEFORE:   MOORE, GRIFFIN, and CUDAHY, Circuit Judges.[*]

GRIFFIN, Circuit Judge.

The plaintiffs-appellants, twenty-nine full-service wholesalers that are also direct distributors under distribution agreements with defendant-appellee Philip Morris USA, Inc. ("PM") for the sale of PM tobacco products, brought suit against PM alleging that PM has engaged in price discrimination in violation of Section 2(a) of the Clayton Act, as amended by the Robinson-Patman Price Discrimination Act ("the Act"), 15 U.S.C. § 13(a), and attempted monopolization contrary to the Sherman Act, 15 U.S.C. § 2.  The district court granted summary judgment in favor of PM with regard to both antitrust claims.  Plaintiffs now appeal the summary judgment. For the reasons set forth below, we affirm.

I.

Generally, cigarette brands are divided into four price categories or "tiers."  First-tier, or premium, cigarettes are the most expensive and are sold by manufacturers to wholesalers such as plaintiffs at more than $27 per carton.  First-tier cigarettes are produced primarily by the two largest United States manufacturers, PM and R.J. Reynolds Company ("RJR").  First-tier cigarettes include PM's Marlboro (with a 38% industry market share and representing 77.5% of PM's 2002 volume),

---

[*]The Honorable Richard D. Cudahy, Senior Circuit Judge of the United States Court of Appeals for the Seventh Circuit, sitting by designation.

and RJR's Camel, Winston, and Salem brands.  Approximately 90% of PM's volume consists of first-tier brands versus 73% for the total United States tobacco industry.  Second and third-tier cigarettes, priced substantially lower than first-tier cigarettes, are produced primarily by smaller manufacturers, such as Lorillard and Brown & Williamson.  Fourth-tier brands, also known as deep-discount brands, are produced by even smaller manufacturers, including Liggett and several other new entrants into the cigarette market.  Fourth-tier brands sell at prices significantly lower than third-tier brands.  All discounted brands, whether second, third or fourth-tier, are collectively referred to as "value-priced" or "savings" brands.  PM does not price any of its savings brands at the fourth-tier level.[1]

PM is the leading cigarette manufacturer in the United States by market share (approximately 48%).  Its rivals, however, account for more than half of all cigarettes sold in the United States.  PM sells its products to about 700 distributors nationwide.  These same distributors also distribute cigarettes manufactured by PM's competitors.  Because wholesale distributors sell a wide variety of products, PM and other manufacturers use price incentives to bid for distributors' attention.  Distributors, in turn, receive competing incentives from manufacturers, some of which they accept

---

[1]For further discussion of the cigarette industry, *see Smith Wholesale Co., Inc., et al. v. R. J. Reynolds Tobacco Co.* (the "*Reynolds*" case), 2:03-cv-00030, Case No. 05-6053, — F.3d — (6th Cir. Feb. 27, 2007), a companion case on appeal to this court, in which many of the same plaintiffs involved herein brought a similar action for injunctive relief and monetary damages against another cigarette manufacturer, R.J. Reynolds Tobacco Company, alleging that its Wholesale Partners Program ("WPP"), a market-share discount program applied to its wholesaler customers, violated antitrust laws.  In both cases, heard before the Honorable J. Ronnie Greer, United States District Court Judge for the Eastern District of Tennessee, the plaintiffs, full-service wholesalers, led by original plaintiff Smith Wholesale Company, appeal the district court's orders granting summary judgment in favor of the defendants.  The plaintiffs in both this case and the *Reynolds* case have alleged secondary-line price discrimination in violation of Section 2(a) of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. § 13(a).  The instant case involves an additional claim of an attempt to monopolize in violation of the Sherman Act, 15 U.S.C. § 2.

and some of which they reject. PM, like other cigarette companies, tries to persuade as many distributors as possible to make PM brands their first choice. PM has offered distributor incentives based on market share since 1994. Unlike volume discounts, PM's discounts are based on a distributor's sales of PM cigarettes as a *percentage* of that distributor's total cigarette sales. PM compares (1) the percentage of a distributor's total cigarette sales in a particular geographic area (otherwise known as a "Section") that are PM products (a distributor's "PM share") with (2) share targets based on PM's market share in the Section.[2]

PM's market share fell from 51.6% to 48% between June 2001 and November 2002, as a result of the Master Settlement Agreement of 1998 and the subsequent entry of fourth-tier cigarette manufacturers into the market. PM responded by realigning its discount program, known as the Wholesale Leaders Program ("WL" program) to make it more competitive. The result was the initiation, in 2003, of the Wholesale Leaders 2003 Program ("WL 2003"). The WL 2003 took effect during the third quarter of 2003. The program offered an initial qualification period, was open to all of PM's direct distributors, and its terms were uniformly applied to all PM distributors. PM established three performance levels, lowered the requirements for obtaining the middle and highest level discounts (Levels 2 and 3), and increased the discounts available to distributors at those levels. PM also established a lowest level of discount (Level 1), with no market share requirement for distributors that specialized in the sale of rival brands and reduced the discounts offered to

---

[2]In addition to its twenty-two Sections, PM maintained sales data from each of more than 1,800 sales "territories," geographic units served by a single PM sales representative and consisting of approximately 140 stores.

distributors at that level. Distributors operating in different Sections received varying discounts based on their performance in different Sections.[3]

Thus, pursuant to the WL 2003, a distributor with a PM share below PM's Section share target qualified for Level 1; a distributor with a PM share within range of PM's Section share target earned a larger discount at Level 2; and, a distributor with a PM share above PM's Section target share earned the largest discount at Level 3.[4] Since the program began in 2003, distributors of all sizes have qualified at every level; as a market-share program, PM's formula does not inherently disfavor small buyers.

The WL's maximum per carton price differences between the worst and best price from the second quarter of 1999 to the present were as follows: second quarter 1999 - second quarter 2000 ($0.23); third quarter 2000 - first quarter 2002 ($0.30); second quarter 2002 - second quarter 2003 ($0.32); third quarter 2003 ($0.81); fourth quarter 2003 ($0.55); first quarter 2004 - fourth quarter 2005 ($0.24); and first quarter 2006 ($0.36).

On June 11, 2003, sixteen plaintiffs, all full-service distributors serving grocery stores and other retail outlets in a multi-state region,[5] filed suit against PM, alleging that the WL program

---

[3]From 1999 through the second quarter of 2003, PM's WL program gave a 2.75% gross discount on PM products to all direct distributors. The WL program also paid quarterly rebates (back-end monies) conditioned on the distributors achieving market share-based quotas of PM brands. In the fourth quarter of 2003, PM eliminated the back-end money component of its WL program. For the first quarter of 2004, PM again revised its WL program, providing for a 2% base discount plus $0.07 per carton in back-end monies for Level 1 distributors, and a 2% base discount plus $0.26 in back-end monies for Level 2 distributors.

[4]No distributor's PM share had to be higher than 49.9% to achieve Level 3.

[5]Tobacco products constitute 50% or more of plaintiffs' revenues.

constituted illegal price discrimination and an attempt to monopolize under federal antitrust laws, specifically the Robinson-Patman Act, 15 U.S.C. § 13(a), and the Sherman Act, 15 U.S.C. § 2. Plaintiffs maintain that PM's highest share quotas and its most favored prices are not realistically achievable by plaintiffs; no plaintiff has ever received the WL's best price on all of its PM purchases. In July 2003, the states of Tennessee and Mississippi filed intervenor complaints after obtaining leave of the district court.

Plaintiffs sought a preliminary injunction to enjoin PM from discriminating as to the plaintiffs under its WL 2003. On August 6, 2003, the district court granted injunctive relief, enjoining PM from providing lower price discounts and/or rebates to the plaintiffs than were provided to the plaintiffs' competitors as proposed in the WL 2003. PM appealed and a stay of the preliminary injunction was granted by this court on September 18, 2003. After oral argument, but before a decision was rendered, PM voluntarily dismissed its appeal. Subsequently, additional new plaintiffs were added in a Second Amended and Restated Complaint filed on November 14, 2003.

On November 1, 2004, PM filed a motion for summary judgment pursuant to Rule 56(c). On August 17, 2005, the district court issued a Memorandum Opinion and Order, in which it granted summary judgment in favor of PM and dismissed the complaint. With regard to plaintiffs' Robinson-Patman Act claim, the district court reiterated the rationale it used in granting summary judgment in the companion *Reynolds* case. The court concluded that "PM's discount was functionally available to the plaintiffs in both theory and in fact":

> The Court FINDS that the undisputed fact that an outside influence, not in the control of PM, i.e. plaintiffs' customer demands, frustrated their performance does not render the discounts under PM's WL program functionally unavailable. Therefore, because

PM's discount is functionally available under the undisputed facts of this case, the defendant has demonstrated the lack of an essential element of the plaintiffs' case, i.e. price discrimination, and PM is entitled to summary judgment on plaintiffs' Robinson-Patman Act claims.

In this case, the Court also FINDS that there is no causal link between PM's practices and the plaintiffs' alleged injuries. Plaintiffs contend that they did not make a voluntary choice to emphasize fourth-tier or other non-PM brands over PM's products, but that they have simply responded to the demands of their customers. Therefore, by their own admission, the plaintiffs' inability to participate in WL is attributable to an outside influence over which PM had no control. In effect, the plaintiffs seek to reap the rewards of the WL without furthering the purpose of that program, i.e., increasing the demand for PM products.

With regard to plaintiffs' Sherman Act claim, the district court noted that "[a] claim of attempted monopolization requires: (1) a specific intent to monopolize; (2) anti-competitive conduct; and (3) a dangerous probability of success," as evidenced by proof of market power in the relevant market. *Tarrant Serv. Agency, Inc. v. Am. Standard, Inc.*, 12 F.3d 609, 615 (6th Cir. 1993). The district court concluded that because plaintiffs failed to establish genuine issues of material fact relating to these three requisite elements, PM was entitled to summary judgment. Plaintiffs now timely appeal.

II.

A.

Plaintiffs first argue that they have proven all of the necessary elements of a prima facie secondary-line Robinson-Patman Act price discrimination claim pursuant to 15 U.S.C. § 13(a): (1) PM's cigarette sales are in interstate commerce; (2) PM cigarettes sold to plaintiffs are of like grade and quality as those sold to their most favored competitors; (3) PM discriminated in price between these competing distributors of like commodities; and (4) the effect of such discrimination was to

injure, destroy, or prevent competition to the advantage of the favored purchaser. *Volvo Trucks*

*North America, Inc. v. Reeder-Simco GMC, Inc.* ("*Volvo Trucks*"), 564 U.S. 164; 126 S. Ct. 860,

870; 163 L. Ed. 2d 663 (2006). Alternatively, plaintiffs assert that genuine issues of material fact

exist regarding the functional availability of PM's best discounts.

Plaintiffs' price discrimination claim centers on the allegations contained in ¶¶ 44-45 of their

Second Amended and Restated Complaint:

44.

Through the Program, PM is favoring distributors who reduce their sales of competitors' products, including those who do not sell a significant amount of 4th tier brands. Distributors such as Plaintiffs who cannot qualify for the best available prices (i.e. previously full Level 3, now full Level 2) under the Program pay much higher prices for Marlboro, which is a "must-carry" brand for all retailers. As a result, Plaintiffs previously had to either increase the price they charged retailers for PM products or temporarily absorb the price difference, often selling such products below cost. Either way, the Plaintiffs have been significantly and irreparably injured. PM's objective appears to be to weaken, and ultimately put out of business, those distributors most responsive to the demand for competitor and 4th tier brands. Indeed, industry analyst Bonnie Herzog of Citigroup has expressly noted that a "primary objective" of the Program is "to restrict the sale of deep discount 4th Tier brands."

45.

The majority of Plaintiffs only can be Level 1 distributors because their sales of PM's cigarettes are much lower than PM's Level 2 target percentages. Prior to the 1st Quarter of 2004, to even qualify for Level 2 status, Plaintiffs needed on average to have raised their sales of PM cigarettes as a percentage of their sales of all manufacturers' cigarettes from 28.7% to 42.9%; Full Level 3 status required an on average increase from 28.7% to 49.2%. Given Plaintiffs' existing customer bases, their "low-end" areas of sales, PM's market share and the increased demand for competitor and 4th tier products by consumers, full Level 3 pricing was, as a practical reality, unavailable to them.

Plaintiffs aver that as full-service distributors, they do not have control over their market or product mix; rather, plaintiffs must sell what their retailers order, which in turn is driven by consumer demand. Thus, because fourth-tier brands have grown in response to consumer demand in the markets serviced by plaintiffs, and PM's dominant brands, such as Marlboro, have not changed significantly in market share, the only way for plaintiffs to even theoretically reach the WL's highest target percentages is to stop selling, or dramatically reduce, their sales of competitor cigarette brands, including fourth-tier brands. Second Amended Complaint, ¶¶ 46-47. However, "[p]laintiffs' retail customers will not accept this drastic change to the Plaintiffs' mix of product offerings because many of these retailers' customers cannot afford premium cigarettes. These retailers will shift the bulk of their purchases to a more favored distributor." *Id*. at ¶ 47.

Plaintiffs argue that because of overwhelming demand among their customer base, they began carrying a variety of competitors' discount products prior to 1999. Plaintiffs must sell non-PM cigarettes to satisfy the demand for lower-priced brands from the lower socioeconomic consumers their retailer-customers serve. Plaintiffs complain that, while they are forced to carry these non-PM fourth-tier brands to maintain their retail customer base, certain of plaintiffs' competitors did not have to carry them before 2000, either because they already enjoyed a higher-end customer base that demanded little or no discount product or they were predominantly fill-in suppliers. Thus, the majority of plaintiffs allegedly received the lowest WL payments at the start of the complaint period in 1999 while, at the same time, their more favored competitors immediately enjoyed the best WL pricing. Consequently, plaintiffs argue, these more favored competitors never

faced the same unreasonable business decision as plaintiffs of abandoning a large part of their customer base by discontinuing the competitor products their retail customers demanded.[6]

Plaintiffs further claim that an examination of WL's highest share targets reveals that PM often sets them far above its alleged Section market share. According to plaintiffs, in the first quarter of 2003, more than half of PM's highest Level 3 Section targets where plaintiffs operate exceeded PM's alleged Section market share. Plaintiffs argue that PM's claim, that the WL's target was set at least four share points below PM's alleged Section market share, is deceptive because the referenced Section target actually measured the Level 2 target, the intermediate price level, which would not entitle a distributor to PM's best discounts and back-end monies.

Plaintiffs also allege that PM has used faulty data in determining its share targets, thus significantly overstating its market share during the complaint period. Consequently, plaintiffs claim that the district court erred in failing to find that WL's grossly inflated share targets, which made it mathematically impossible for the vast majority of distributors to achieve the WL's best price – were solely within PM's control.

In addition, plaintiffs contend that the disparity between the WL's highest share targets and PM's alleged market share is further exacerbated when regional market areas within each Section are examined and the demographics of the areas are scrutinized. According to plaintiffs, the WL's Sections are artificial constructs with no specific relationship to the cigarette market; premium and

---

[6]Plaintiffs assert that they do not necessarily profit by selling rival brands – multiple plaintiffs testified that they actually made less money on fourth-tier brands than PM brands because fourth-tier manufacturers do not pay rebates. Although the margin percentage on fourth-tier brands may sometimes be higher than on premium brands, the greater price of PM brands earns every distributor more per carton on Marlboro than on any discount brand.

discount sales areas are allegedly lumped together into a single Section that can include up to six

states and does not account accurately for differences in demographics and income.[7]

Finally, plaintiffs argue that the district court failed to draw an inference from PM's own data

that the WL's best price is not practically achievable by all distributors. Plaintiffs contend that PM's

data shows that in the first quarter of 1999, only 366 of 1,051 distributors (34.8%) received close to

the best price; in 2002, fewer than 17% of distributors achieved the WL's best price on 100% of their

PM volume; in the first half of 2003, fewer than 27% of distributors received full Level 3 monies;

and, in 2003, over 50% of PM's distributors failed to fully qualify for the Level 2 pricing.

B.

In our published opinion issued in the companion case, *Smith Wholesale Company, Inc. v.*

*R. J. Reynolds Tobacco Co.*, Case No. 05-6053,[8] we engaged in a detailed discussion of the doctrine

of functional availability in the context of a secondary-line Robinson-Patman price discrimination

claim. The same legal analysis is applicable to the claims against PM, and, indeed, plaintiffs' legal

arguments mirror, in all relevant respects, those made by the *Reynolds* plaintiffs. Thus, for purposes

of the present appeal and to avoid redundancy, we adopt and incorporate by reference the standard

of review, legal analysis, and authorities discussed in *Reynolds*.

As we highlighted in *Reynolds*:

---

[7]Plaintiffs maintain that "[i]t makes sense to significantly lower share targets in [certain] areas (Baltimore, Washington, D.C. and Chicago) heavily populated by minorities because only two percent of Marlboro smokers are black. This is in sharp contrast to the fact that 50% of competitor menthol Newport smokers are black. Several Plaintiffs operate in significant minority markets." Plaintiffs note than PM briefly established subsection share targets that reflected these market variations but eliminated them in 2002. (Plaintiffs' Brief, p. 33 n.16).

[8]*See* Text, n.1, *supra*.

> [T]he functional availability doctrine has been applied historically in the context of quantity discounts, yet its underlying rationale – that a discount equally and realistically available to all purchasers of a like commodity does not constitute discrimination in price within the meaning of § 13(a) – is no less relevant in judging the legality of market-share discount formulas such as the WPP.
>
> The doctrine seemingly defies the logic that a rational purchaser of goods will always seek to obtain the best discount or concession that is available to it; if a higher discount is realistically and practically available, why would a reasonable purchaser *not* take advantage of the best possible price? However, the functional availability doctrine reflects the realities of the marketplace and recognizes that purchasers in competitive markets, particularly multi-brand distributors or wholesalers, must make difficult economic choices, prioritize brand sales and often decline conditional discounts for reasons unrelated to their actual ability to obtain them. Thus, . . . courts have refused to find price discrimination under § 13(a) when the purchaser's decision or capacity to take advantage of the best discount made "available on a reasonably equivalent basis to all dealers who made the commitment to obtain them" was determined by elements within its control – i.e., unrelated investments; poor credit ratings; management issues, inventory decisions, or marketing strategies; or a decision to promote the competitor's product – and not by disproportionately small purchasing power or the pricing structure itself.

*Reynolds*, — F.3d at — (citations omitted) (Slip op. at 16).

"The doctrine also underscores the fact that the Robinson-Patman Act neither ensures success nor excuses purchasers from making difficult decisions about which competing brands to carry, market, or promote . . . ." *Id*. We further noted that, in its recent decision in *Volvo Trucks*, the Supreme Court emphasized that "Robinson-Patman does not ban all price differences charged to different purchasers of commodities of like grade and quality; rather, the Act proscribes price discrimination only to the extent that it threatens to injure competition." *Volvo Trucks*, 126 S. Ct. at 870 (internal quotation marks and citations omitted). The *Volvo Trucks* Court "would resist interpretation [of the Robinson-Patman Act] geared more to the protection of existing *competitors* than to the stimulation of *competition*." *Id.* at 872.

C.

The parties do not dispute that the first two elements of a secondary-line price discrimination claim have been established – the relevant sales were made in interstate commerce and the commodities were of like grade and quality. *Volvo Trucks*, 126 S. Ct. at 870. It is the latter two elements – whether defendant discriminated in price between different purchasers of commodities of like grade and quality, and whether the effect of that discrimination was to substantially lessen competition or tend to create a monopoly in any line of commerce – that are at issue in the present appeal.

In the context of this summary judgment review, in which we view the documentary evidence in the light most favorable to the non-moving party, *Kessler v. Visteon Corp.*, 448 F.3d 326, 329 (6th Cir. 2006), we nonetheless conclude that summary judgment was properly granted in favor of PM by the district court. The undisputed material facts show that PM's best discount pursuant to the WL program is functionally available to plaintiffs pursuant to a market-share based pricing formula that is uniformly applied to all of PM's approximately 700 direct distributors operating throughout the country.

The WL program, like the WPP program at issue in *Reynolds,* does not bear the obvious characteristics of a discriminatory pricing program. The relevant discounts are not based on minimum volume,[9] plaintiffs do not allege that they were foreclosed from participation in the WL

---

[9]Plaintiffs *do not* aver in their Second Amended and Restated Complaint that the WL program discriminates on the basis of volume of sales, but they now allege that the WL is structured to favor large volume distributors over smaller ones, noting that "50% of PM dollar sales volume is controlled by the 13 largest distributors who generally receive the maximum WL monies." (Plaintiffs' Brief, p. 34). However, the proofs submitted by defendant in support of its summary judgment motion refute this general contention that the WL program inherently favors large volume

program, and there is no evidence that PM manipulated the WL to favor certain wholesalers. PM accounts for geographic market share variations by dividing the country into twenty-two Sections and setting different market-share targets for each Section. The targets for Level 2 discounts, the middle level, are set at least four share points below PM's actual market share in every Section, and the Level 3 (most favorable discount) targets are set in relation to the Level 2 targets, and a distributor need not have a PM share greater than 49.9% to achieve Level 3. Thus, in every Section, a distributor could qualify for Level 2 with a PM share below PM's market share. Correspondingly, in ten of the twenty-two Sections, the Level 3 target was also below PM's Section market share and, in the remaining twelve Sections, the Level 3 target was never more than six points above PM's Section market share. Every distributor's performance within the Section is judged by the same standards and each wholesaler performs equivalent functions to obtain the discounts. Distributors have reached Level 3 in all of the twenty-two Sections.

The evidence of record indicates that, pursuant to this pricing scheme, nearly half of all distributors had all of their volume at Levels 2 or 3; four out of every five distributors qualified at least one-third of their PM volume at Levels 2 or 3; roughly half of all distributors (almost 350)

---

purchasers. Ranking all PM wholesalers by size, based on industry volume, and dividing them into three groups (large, middle, and small), the data indicates that the number and percentage of wholesalers with all of their PM volume at Levels 2 and 3 of the WL 2003 is consistent across the various size groupings. Among the 232 largest wholesalers, 113 (48.7%) had all of their PM volume at Levels 2 or 3; among the middle group of 231 wholesalers, 108 (46.7%) had all of their PM volume at Levels 2 or 3; and, among the 232 smallest wholesalers, 116 (50%) wholesalers qualified all of their PM volume for Levels 2 or 3. Similarly, more of PM's smallest distributors also had all of their PM volume at Level 3 than did the middle or largest distributors during a designated period in 2003. Six of the ten smallest distributors in the United States, including the two smallest, had all of their volume at Level 3, while only one of the ten largest distributors had all of its volume at Level 3.

qualified some volume for Level 3; more than one-third (over 200) qualified at least half of their PM

volume at Level 3; and more than a quarter (almost 200) qualified all of their volume at Level 3.

Plaintiffs' allegation that "[n]o Plaintiff achieved the best price under PM's 2003 Program

(i.e., full Level 3 pricing for all its PM volume)"[10] and their contention that the vast majority of

distributors could not qualify for the best price – an argument based on the percentage of distributors

that *actually received PM's best price on 100% of their PM volume* – transform the relevant legal

question, whether PM's best price is "available," into the irrelevant question whether most

distributors actually accepted PM's best offer. As we noted in *Reynolds*:

> Plaintiffs complain that only a small percentage of wholesalers actually reached [the highest discount level]. However, this is a neutral fact, not a material issue, which simply reflects the outcome of different choices made by different wholesalers. The legality of RJR's incentive program does not turn on whether, in fact, each wholesaler actually achieved the highest level in the WPP program. The very nature of an incentive program necessarily leads to different outcomes based on performance. As long as defendant offered the same best price to plaintiffs as to their competitors, using a nondiscriminatory pricing formula, defendant did not violate the Robinson-Patman Act.

*Reynolds*, — F.3d at — (citations omitted) (Slip op. at 22).

Distributors qualify different percentages of their volume at different levels as they respond

to competition, and, in fact, it is an anticipated norm in the cigarette market that multi-brand, full-

service distributors will not always accept or seek to attain a particular manufacturer's best prices

in all of their sales areas. Here, the undisputed evidence confirms that the WL's most favorable

discount is functionally available to all of PM's direct distributors, not because a certain percentage

of these distributors actually sought and obtained PM's best discount, but because the discount is

---

[10]See plaintiffs' Second Amended and Restated Complaint, ¶ 38.

offered on reasonably equivalent terms to all distributors, without regard to quantity purchasing power.[11]

Plaintiffs nonetheless maintain that full Level 3 pricing is, as a practical reality, unavailable to them "given [their] existing customer bases, their 'low-end' areas of sales, PM's market share and the increased demand for competitor and 4th tier products by consumers[.]" (Second Amended Complaint, ¶ 45). Plaintiffs complain that "[t]he fact that many Plaintiffs operate in heavily populated minority markets that do not purchase sufficient PM products to meet Level 3's grossly inflated share targets confirms multiple impediments to achieving WL's best price" and that "the overwhelming majority of PM market shares in zip codes served by Plaintiffs fall well below WL's Level 3 targets, and some even fall below the Level 2 targets." (Plaintiffs' Reply Brief, p. 9.) Plaintiffs suggest that more detailed data pertaining to the peculiar demographics of certain sales areas should be integrated into the WL, and subsections within each Section established to better reflect the realities of the market in those areas.

It is undisputed, however, that PM's market share in plaintiffs' sales area, defined by zip code, is equivalent to PM's market share in the Sections that include those sales areas. It is noteworthy that almost every plaintiff sells non-PM products at a much higher percentage than the market shares of those products in plaintiffs' sales areas, indicating that a particular sales mix is not necessarily inhibited by a manufacturer's overall market share in the sales area. Even assuming that PM did, in fact, as plaintiffs allege, inflate its market shares in the various Sections, plaintiffs have

---

[11]PM has presented evidence that numerous distributors, including some plaintiffs (such as Taylor, Huntsville, Eby-Brown, and Smith), actually increased their PM shares and altered their sales mix sufficiently to move from the lowest to higher levels during WL 2003.

not demonstrated how the purported discrepancy between actual and reported market shares affected plaintiffs more than other supposedly favored wholesalers, or how this allegedly improper calculation detrimentally impacted competition. *Reynolds*, — F.3d at — (Slip op. at 22).

Plaintiffs, in essence, advocate tailor-made discounts, a concept that would undo the very basis of a market-share based incentive program and run afoul of the Robinson-Patman Act. As we emphasized in *Reynolds*, "we will not entertain plaintiffs' invitation to re-engineer the uniformly applied [WL] incentive program to make it more reasonable for some participants." *Reynolds*, — F.3d at — (Slip op. at 22). The WL formula may be imperfect, but it is not, under these particular circumstances, illegal, given its evenhanded application and the fact that its best discount is functionally available to all participants.

In sum, as we observed in *Reynolds*, "[t]he undisputed evidence demonstrates that plaintiffs faced a choice that was 'not an inequity imposed by the pricing structure but a fundamental economic conundrum faced by all sellers.'" *Reynolds*, — F.3d at — (Slip op. at 22) (quoting *Krist Oil Co., Inc. v. Bernick's Pepsi-Cola of Duluth, Inc.*, 354 F. Supp. 2d 852, 857 (W.D. Wis. 2005)). All multi-brand, full-line distributors make different choices, on an ongoing basis, as to where to operate, what products to sell, which retail customers to serve, what prices to charge, and how to sell those products. In making their pricing decisions, wholesalers take into account the demand of their customers and their entire product mix. These choices lead each one to sell PM products in varying percentages of their overall cigarette sales.

Here, in the absence of evidence of discriminatory application of the market-share incentives, and in light of deposition testimony of plaintiffs' representatives consistently indicating that brand

prioritization and marketing strategy governed their level of participation in the WL, we can only

conclude that it is these choices, not PM's formula, that determine whether plaintiffs will earn PM's

higher discounts. Plaintiffs chose to focus on selling rival products, particularly fourth-tier products

that typically offer higher profit margins for plaintiffs than PM's products. Wholesalers that choose

to direct their efforts away from PM brands should not, however, reasonably expect to receive the

same incentive payments awarded to those wholesalers that provide greater support for PM brands.

To mandate equal incentive payments would not only create inefficient distribution cost imbalances

in the cigarette market by requiring manufacturers such as PM to pay a disproportionate share of its

lowest-performing wholesalers' distribution costs, but would also undermine the competitive

purpose behind the market-share incentive program.

Under the circumstances, we therefore affirm the district court's order granting summary

judgment in favor of defendant PM with regard to plaintiffs' Robinson-Patman price discrimination

claim. PM does not provide discounts based on minimum volume, thereby favoring those

distributors with the most volume purchasing power; the allegedly favored distributors are not large

independent department stores or chain operations, and the price discounts foster – not impede –

competition among suppliers of different brands. *Volvo Trucks*, 126 S. Ct. at 873. The WL program

awards discounts to those distributors who, within the parameters of their existing capacity, help PM

compete more effectively by aligning their own competitive business objectives with those of PM.

Manufacturers need not "guarantee that all customers benefit to the same degree," *Comcoa, Inc. v.*

*NEC Tel., Inc.*, 931 F.2d 655, 664 (10th Cir. 1991), but must make their discounts available through

an evenly administered program. Because the WL's market-share discount was offered to all of

PM's direct distributors, including plaintiffs, using a non-discriminatory formula that was functionally available to plaintiffs, an essential element of a secondary-line price discrimination claim – discrimination in price between distributors of like commodities – has not been established, and plaintiffs' claim fails as a matter of law.

### III.

In addition to their claim of price discrimination under the Robinson-Patman Act, plaintiffs allege that PM has engaged in an attempt to monopolize contrary to the Sherman Act, 15 U.S.C. § 2. As explained by this court in *Spirit Airlines, Inc. v. Northwest Airlines, Inc.*, 431 F.3d 917 (6th Cir. 2005):

> Section 2 of the Sherman Act, in pertinent part, makes it unlawful to "monopolize, or attempt to monopolize, . . . any part of the trade or commerce among the several States . . . ." 15 U.S.C. § 2. "[Section] 2 addresses the actions of single firms that monopolize or attempt to monopolize . . . . The purpose of the Act is not to protect businesses from the working of the market; it is to protect the public from the failure of the market." *Spectrum Sports Inc. v. McQuillan*, 506 U.S. 447, 454, 458 (1993). Under this statute, the defendant must "use . . . monopoly power 'to foreclose competition, to gain a competitive advantage, or to destroy a competitor.'" *Eastman Kodak* [*Co. v. Image Tech. Servs., Inc.*], 504 U.S. [451] at 482-83 [(1992)] (quoting *United States v. Griffith*, 334 U.S. 100, 107 (1948)).

*Spirit Airlines, Inc.*, 431 F.3d at 931-32.

"A claim for attempted monopolization under section two of the Sherman Act requires: (1) a specific intent to monopolize; (2) anti-competitive conduct; and (3) a dangerous probability of success." *Tarrant Serv. Agency, Inc.*, 12 F.3d at 615. Market strength that approaches monopoly power (the ability to control prices and exclude competition) is a necessary element for showing a dangerous probability of achieving monopoly power in an attempt to monopolize case. *Id.* The

analysis in this regard requires that the court focus on the ability of a single seller to unilaterally raise prices and restrict output. *Spectrum Sports Inc.*, 506 U.S. at 457.

Here, plaintiffs claim that PM's dollar share of the cigarette market (56%) makes it the dominant company in the domestic cigarette market. PM's market share based on units sold is, according to plaintiffs, 49.6%. Plaintiffs also noted that PM's market share probably understates its market power, in light of the fact that PM and R.J. Reynolds have a combined market share of approximately 83%. However, "market share is only a starting point for determining whether monopoly power exists, and the inference of monopoly power does not automatically follow from the possession of a commanding market share[,]" *Amer. Council of Cert. Podiatric Physicians and Surgeons v. Amer. Bd. of Podiatric Surgery, Inc.*, 185 F.3d at 606, 623 (6th Cir. 1999), and considering a combination of market shares of more than one company is an inappropriate measure of PM's market power. *Arthur S. Langenderfer, Inc. v. S.E. Johnson Co.*, 917 F.2d 1413, 1433 (6th Cir. 1990). Market power under § 2 of the Sherman Act is "the ability of a single seller to raise prices and restrict output." *Virgin Atl. Airways, Ltd. v. British Airways*, 257 F.3d 256, 265 (2d Cir. 2001) (citation omitted).

Under the circumstances, the district court aptly concluded that there is no evidence, either direct or indirect, that PM possesses monopoly power. The fact that PM prices its cigarettes at almost five times the level of fourth-tier brands is not indicative of PM's ability to unilaterally control the price. To the contrary, both before and since implementation of the WL, when PM lost market share, it responded by lowering prices. Marlboro's average retail price remains lower than

prices of other key premium brands and became even lower after the introduction of the WL 2003 program.

Moreover, there is no evidence that PM has the power or ability to control other firms' production capacity. The undisputed evidence of record indicates that, after the industry's Master Settlement Agreement in 1998, the competition from fourth-tier cigarette manufacturers has expanded rapidly and made the relevant market even more competitive than ever. Indeed, this increased competition is the motivating factor behind PM's new discount incentives.

A firm also lacks market power when its competitors have excess production capacity and can produce more than the market demands at a competitive price. *Rebel Oil Co., Inc. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1441 (9th Cir. 1995). It is undisputed that substantial excess production capacity exists in the U.S. cigarette market. R. J. Reynolds and Lorillard, with a combined market share of less than 30%, together have the capacity to produce nearly 50% of the 400 billion cigarettes consumed in the United States. PM cannot price above competitive levels because rivals will simply enter and increase input. As the district court opined in its well-reasoned opinion in this regard:

> [P]laintiffs have been unable to establish that WL decreases rather than increases competition. At best, plaintiffs' proof establishes only harm to individual competitors, not harm to competition. Plaintiffs have failed to present evidence that creates a genuine issue of material fact to support their allegation that WL has foreclosed any cigarette manufacturers from access to the relevant market.

> The relative lack of difficulty of entry into the U.S. cigarette industry likewise negates plaintiffs' claim of anti-competitive conduct. Were PM to charge a price above the competitive price for its products, this record establishes that either existing competitors (RJR and Lorillard) or new competitors would enter the market (or increase production) and undercut PM's price. As indicated above, RJR and Lorillard together possess about fifty percent (50%) of the excess capacity for production of cigarettes and dozens of new manufacturers have entered the market

since 1998. PM's WL program is a valid business reaction to market pressure brought about by increased competition for a declining cigarette market. Moreover, these plaintiffs admit that, were they to choose to discontinue sales of fourth tier brands altogether in order to achieve PM's best discounts, those brands would immediately be picked up by a competing distributor.

Thus, not only have plaintiffs not established a genuine issue of material fact on the issue of whether PM possesses sufficient market power to establish a dangerous probability of monopolization, no genuine issue of material fact exists on the issues of whether or not PM has engaged in anti-competitive conduct with the specific intent to monopolize. PM is likewise entitled to summary judgment on these grounds.

We agree with the district court's assessment that plaintiffs' Sherman Act attempted monopolization claim fails as a matter of law and therefore affirm the summary judgment in favor of PM on this issue.

IV.

For the reasons stated, the judgment of the district court is affirmed.