

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-12-2008

# Danvers Mtr Co Inc v. Ford Mtr Co

Precedential or Non-Precedential: Precedential

Docket No. 07-2287

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"Danvers Mtr Co Inc v. Ford Mtr Co" (2008). *2008 Decisions.* Paper 443.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/443

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 07-2287

DANVERS MOTOR CO., INC., a Massachusetts
corporation; BOB CHAMBERS FORD, d/b/a Augusta Ford,
a Maine corporation;
CONCORD FORD-LINCOLN-MERCURY,
a New York corporation;
FETTE FORD INC., a New Jersey corporation;
SENATOR FORD, INC., a Delaware corporation;
ROSEVILLE MIDWAY FORD COMPANY,
a Minnesota corporation;
FULLERS' WHITE MOUNTAIN MOTORS,
an Arizona corporation;
CONDON FORD, INC., an Iowa corporation;
G. & S. MANAGEMENTCORPORATION,
on behalf of themselves and all others similarly situated,
d/b/a  Tilton Ford, a New Hampshire corporation,

v.

FORD MOTOR COMPANY,

Appellant.

On Appeal from the United States District Court
for the District of New Jersey
(D. C. No. 02-cv-02197)
District Judge:  Hon. Dennis M. Cavanaugh

Argued on March 6, 2008

Before:  FISHER, GREENBERG and ROTH, Circuit Judges

(Opinion filed :  September 12, 2008)

James F. Hibey, Esquire  (ARGUED)
Lisa K. Hsiao, Esquire
Howrey
1299 Pennsylvania Avenue, N. W.
Washington, DC   20004

Romeo S. Quinto, Jr., Esquire
Howrey
321 North Clark Street
Suite 3400
Chicago, IL   60610

Counsel for Appellant

2

Eric L. Chase, Esquire (ARGUED)
Bressler, Amery & Ross
325 Columbia Turnpike
P. O. Box 1980
Florham Park, NJ   07932

      Counsel for Appellee Fette Ford, Inc.

Barry S. Goodman, Esquire (ARGUED)
Greenbaum, Rowe, Smith & Davis
P. O. Box  5600
Metro Corporate Campus One
Woodbridge, NJ     07095

      Counsel for Appellee Danver Motor Co., Inc.

---

O P I N I O N

---

**ROTH,** <u>Circuit Judge</u>:

Ford Motor Company appeals the certification of a class of Ford dealers in an action alleging violations of the Robinson-Patman Act, the Automobile Dealer's Day in Court Act, and numerous state franchise laws, as well as breach of contract and the covenant of good faith and fair dealing.  We hold that the prerequisites for a class action are not met in this case. Accordingly we will vacate the order of the District Court and remand for decertification of the class and further proceedings.

3

## I. **Factual and Procedural Background**

In November 2000, some of the current plaintiffs, on behalf of a proposed class of Ford dealers, filed suit, alleging that Ford's Blue Oval Program (BOP) violated state and federal law. The District Court for the District of New Jersey dismissed the case without prejudice for lack of standing. *Danvers Motor Co. v. Ford Motor Company*, 186 F. Supp. 2d 530 (D.N.J.). The plaintiffs did not appeal this ruling.

The current plaintiffs filed a revised complaint in May 2002 and, of relevance to this appeal, an amended and supplemented complaint in January 2003. The District Court again held that eight of the nine named plaintiffs lacked standing. On appeal, we reversed. *Danvers Motor Co. v. Ford Motor Company*, 432 F.3d 286 (3d Cir. 2005). Plaintiffs then moved to certify a class of Ford franchisees who were affected by Ford's BOP. The District Court granted plaintiffs' motion and certified a class. We granted Ford leave to appeal pursuant to Rule 28 U.S.C. § 1292(b).

The Blue Oval Program was instituted by Ford in April 2000 and terminated in March 2005. Ford created the BOP to improve dealer performance and customer satisfaction. The BOP provided cash bonus payments and other benefits to Ford dealers who improved customer satisfaction according to certain criteria. The BOP was voluntary but was available to all Ford dealers.

The BOP established requirements in a number of areas: Leadership, Concern Resolution, Sales, Service, Facilities, and

4

Customer Sales and Service Satisfaction as determined by the survey process. In addition, all Ford dealers were required to pay a 1% assessment on all Ford vehicles, although there was no increase in the Manufacturer's Suggested Retail Price (MSRP). Dealers who obtained Blue Oval Certification under the BOP were eligible to receive certain monetary and non-monetary benefits. Dealers who met the initial certification requirements by April 17, 2001, received a reimbursement from Ford of 1.25% of the MSRP for each vehicle sold. Dealers who qualified for certification prior to April 17, 2002, received a 1.0% reimbursement.[1] In addition to these rebates, certified dealers received an increase in After-Warranty Adjustment Allowance Levels, a ten-percent increase in Ford's transportation assistance allowance, a fifty-percent discount on all retail invoice messages, up to fifty-percent tuition reduction on finance and insurance-related courses, a 401K plan for dealer employees, the Blue Oval Certified Healthcare Plan, and Blue Oval National Advertising.

The BOP established the Voice of the Customer (VOC) Index, which used survey responses from a dealer's sales and service customers to measure that dealer's customer satisfaction levels. The target VOC Score for a particular dealer depended on factors such as dealer size and location. Some dealers met their target score with relatively little effort. Others had to work

---

[1]The percentage of the rebates was subsequently reduced. Rebates were scheduled to drop from 1% or 1.25% initially to 1% in April 2003, 0.75% in April 2004, and 0.50% in April 2005.

5

over a period of time to increase the VOC score to the target level to apply for certification. If a dealer's VOC score was high enough, that dealer was entitled to automatic certification. Dealers with a lower score could become certified by satisfying certain sales, service, and facilities criteria. Large dealers were evaluated by an independent contractor. Small and/or rural dealers were able to self-evaluate.

Plaintiffs contend that because of the differences in certification standards and processes, the requirements to achieve certification varied. In their amended complaint, plaintiffs allege that, through the BOP, Ford violated three provisions of the Robinson-Patman Act, 15 U.S.C. §§ 13(a), 13(d), and 13(e), the Automobile Dealer's Day in Court Act, 15 U.S.C. §§ 1221-25, and various state franchise laws. They also allege breach of their Sales and Service Agreement with Ford and of the implied covenant of good faith and fair dealing. Plaintiffs seek both injunctive relief and damages on behalf of approximately 4,000 Ford dealers.

Plaintiffs assert that the BOP was meant "to determine the size and makeup of [Ford's] dealer distribution system without regard to the dealers' rights." They claim that dealers, who were not certified, faced in effect the constructive termination of their franchises; further, because dealers were required to re-certify every year and Ford could unilaterally change both the VOC Index and the Blue Oval Program, all dealers faced the risk of not being certified. Plaintiffs allege that all of them made significant investments to comply with the requirements of certification and re-certification under the BOP.

6

However, given that some dealers were certified and other were not and that dealers expended different efforts with respect to certification, the dealers were impacted by the BOP in different ways. Specific injuries alleged by the nine named plaintiffs demonstrate these differences:

1) Danvers Motor Co. became Blue Oval Certified on April 5, 2002. Danvers spent tens of thousands of dollars in management time to become certified and to maintain certification. Danvers did not receive either the 1% or the 1.25% rebate during the period that it was not certified. Certified dealers in Danvers' market allegedly told Danvers customers not to buy from Danvers because it was not certified.

2) Bob Chambers Ford (Augusta Ford) became certified on November 9, 2001, at which point it became eligible for the 1% rebate. Augusta Ford spent nineteen months and had to engage outside assistance to obtain certification. During this time, Ford dealers in the same market had been automatically certified or able to certify earlier because of the VOC Index. After obtaining initial certification, Augusta Ford incurred additional costs to re-certify based on the independent contractor evaluation.

3) Concord Ford-Lincoln-Mercury certified automatically on December 23, 2000, because its VOC scores were already above target. Concord automatically re-certified for 2002. Concord was therefore qualified to receive the 1.25% rebate. Concord alleges, however, that its profit margin was reduced, it lost sales to other makes of automobiles, and it suffered from underallocation of vehicles. Concord also claims that in the

7

future it might not be able to certify based solely on the VOC Index, at which point it would need to satisfy other BOP criteria.

4) Condon Ford certified on December 10, 2000, making it eligible for the 1.25% rebate. However, Condon lost its certification on March 11, 2002, because it failed to meet its VOC Index. Condon spent thousands of dollars to re-certify. Condon believes that other dealers (related to or financed by Ford) in the same market had lower VOC targets. Condon alleges that, as a result of de-certification, not only has it lost the 1.25% rebate, but it also has decreased profits and sales effectiveness, as well as lost sales to other Ford and non-Ford dealers.

5) Fette Ford qualified and applied for certification on April 17, 2001. Fette was certified on June 26, 2001, and received a 1.25% rebate. Fette did not have to make "any major process changes" to obtain certification. However, Fette made significant expenditures to obtain certification, including hiring additional personnel, and incurred further costs for re-certification. Fette believes that Ford dealers are losing business to other makes of automobiles because of the BOP.

6) Senator Ford became certified on January 25, 2001, and received a 1.25% rebate. Senator incurred expenses to certify and to re-certify, including increased personnel costs. Senator expects that it will eventually have to remodel its dealership, at a cost of over $1 million.

7) Midway Ford Company obtained certification on February 13, 2001, thereby qualifying for the 1.25% rebate, but

8

at a cost of hundreds of thousands of dollars. Ford representatives reportedly told Midway management that there were too many Ford dealers in the area and that the BOP was a way to eliminate some of those dealers.

8) Fullers' White Mountain Motors never certified, despite significant expenditures and changes in its business model. Fullers spent thousands of dollars trying to obtain certification. The VOC Index of Fullers, a rural dealership, was higher than that of dealers in a nearby metropolitan area. Fullers believes that it has been undersold by a BOP certified dealer.

9) G&S Management Corporation (Tilton Ford) has not obtained certification although it hired an outside consultant and made other investments of time and money to do so. Tilton claims that Ford assisted other local dealers to obtain certification but ignored Tilton. Tilton also claims that it has been unable to compete with local BOP certified dealers or with dealers of other makes of automobiles.

As noted above, plaintiffs claim that, through its Blue Oval Program, Ford has violated Sections 13(d), 13(e), and 13(a) of the Robinson-Patman Act, the Automobile Dealer's Day in Court Act, and state franchise statutes, and is liable for breach of contract and the implied covenants of good faith and fair dealing.

Section 13(d) of the Robinson-Patman Act prohibits a payment or contract for the payment of anything of value . . . in connection with the processing, handling, sale or offering for sale of any products or commodities manufactured, sold or

9

offered for sale by such person, unless such payment or consideration is available on proportionally equal terms to all other customers competing in the distribution of such products or commodities.

15 U.S.C. § 13(d).

Plaintiffs allege that Ford's "payments to and on behalf of dealers it deemed Certified under the Blue Oval Program, as reimbursement of a percentage of the purchase price and as national advertising" were not intended to be available to all dealers on proportionally equal terms, as required by the Robinson-Patman Act. With respect to the cash reimbursements provided only to certified dealers, plaintiffs claim,

> This deliberately differential treatment dependent on Blue Oval Certification adversely affects competition because Plaintiffs and other Ford dealers who did not receive or do not receive 1.25% of MSRP, 1% of MSRP .75% of MSRP, or even .5% of MSRP, or who lose Certification, as the case may be, cannot compete fairly with other dealers in their respective markets for the purchase of like products from Ford and the sale of such products to consumers; consequently, uncertified dealers who cannot compete face the constructive termination of their franchises.

> Plaintiffs also allege a violation of Section 13(e). Section 13(e) prohibits discriminat[ion] in favor of one purchaser against another purchaser or

10

purchasers of a commodity bought for resale . . . by contributing to the furnishing of, any services or facilities connected with the processing, handling, sale, or offering for sale of such commodity so purchased upon terms not accorded to all purchasers on proportionally equal terms.

15 U.S.C. § 13(e).

Plaintiffs claim that the benefits provided only to certified dealers under the BOP constitute "services or facilities . . . not accorded to all purchasers on proportionally equal terms." They reiterate that, because some dealers must submit to evaluation by an independent contractor while others are permitted to self-certify, certification is not available to all dealers on proportionally equal terms. Plaintiffs allege that

This deliberately differential treatment dependent on Blue Oval Certification adversely affects competition because these Plaintiffs and other Ford dealers who do not receive or lose the benefits . . . cannot compete with dealers in their respective markets for the purchase of like products from Ford and the sale of such products to consumers; consequently, the dealers who cannot compete face the constructive termination of their franchises.

Plaintiffs claim that Ford also violated Section 13(a). Section 13(a) prohibits

11

> discriminat[ion] in price between different purchasers of commodities of like grade and quality . . . where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition . . ..

15 U.S.C. § 13(a).

> Plaintiffs allege that

> The disparate Certification requirements for dealers coupled with a reimbursement of a 1.25% of MSRP to dealers achieving Certification eligibility prior to April 17, 2001, a reimbursement of a 1% of MSRP to dealers achieving Certification eligibility after April 17, 2001 and prior to April 17, 2002 and 1.25% prospectively; and no reimbursement to dealers who fail to achieve or lose Certification eligibility prior to April 17, 2002 or who do not enroll in the Blue Oval Program, constitute unlawful price discrimination pursuant to the Robinson-Patman Act, 15 U.S.C. § 13(a).

Plaintiffs allege further that the Blue Oval Program "discriminates among dealers by making the benefits available only to Certified dealers and their employees."

12

The Automobile Dealer's Day in Court Act permits dealers to bring suit against a manufacturer for "failure . . . to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, canceling, or not renewing the franchise with said dealer . . . ." 15 U.S.C. § 1222. Plaintiffs allege that

> The 'choices' contemplated in the Blue Oval Program are facially coercive in that, to become Certified and then Recertified annually, Plaintiff dealers have committed substantial investments of time, effort, personnel and dollars (with no certainty of Certification, Recertification, or the consistency of the rewards and requirements therefor), while dealers who do not or cannot seek Certification will continue to pay significantly higher prices for their vehicles than Certified dealers.

Plaintiffs allege further that "Ford has professed an intention to leverage its coercive program into a device for selecting dealers for termination, or otherwise causing them constructively or actually to fail . . .."

With respect to their state franchise law claims, plaintiffs allege that the Blue Oval Program "is an illegal means of constructive termination or attempted termination of Plaintiffs' franchises" in violation of state franchise statutes and public policies. They allege that the BOP also violates prohibited practices provisions in state statutes and policies. Plaintiffs

13

claim that the BOP violates the statutes and policies of all states against the termination of a franchise without good or just cause.

Plaintiffs also assert that Ford breached the Sales and Service Agreement. In particular, they claim that the Sales and Service Agreement does not permit either the "coercive and arbitrary control" of dealers, multi-tier pricing, or *de facto* termination imposed by the BOP. Plaintiffs claim that the BOP constitutes an impermissible material unilateral amendment to the Agreement.

Finally, plaintiffs allege that Ford has violated its duty of good faith and fair dealing by imposing the BOP, including by imposing commitments and requirements not contemplated by the Sales and Service Agreement. Plaintiffs allege that Ford has prevented them from enjoying the fruits of the Agreement.

## II. <u>Discussion</u>

The District Court had jurisdiction over plaintiffs' claims under 28 U.S.C. § 1331, 28 U.S.C. § 1337, and 27 U.S.C. § 1367. We have jurisdiction to review the District Court's certification of a class pursuant to 28 U.S.C. § 1292. *See also* Fed. R. Civ. Proc. 23(f).

We review the District Court's decision to certify a class for an abuse of discretion. *Beck v. Maximus, Inc.*, 457 F.3d 291, 295 (3d Cir. 2006). The District Court abuses its discretion where "its decision rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact." *Id.* (internal quotations omitted).

14

A class may be certified only if the prerequisites of Rule 23(a) have been satisfied and the parties seeking class action have shown that the action is maintainable under Rule 23(b). *Id.* at 297. Failure to meet any of Rule 23(a) or 23(b)'s requirements precludes certification. *In re LifeUSA Holding Inc.*, 242 F.3d 136, 147 (3d Cir. 2001).

> Under Rule 23(a), a class may be certified only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.[2]

In addition to those requirements, one of the provisions of Rule 23(b), subsection (b)(1), (b)(2), or (b)(3), must be met. Here the plaintiffs sought class certification under Rule 23(b)(3). Rule 23(b)(3) provides that a class may only be certified if, in addition to the requirements of Rule 23(a), "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and . . . a class action is superior to other available

---

[2]Because the court below issued its decision before the December 2007 Amendments to the Federal Rules of Civil Procedure became effective, we cite to the Rules as they existed prior to the Amendments.

methods for the fair and efficient adjudication of the controversy."

Plaintiffs' claims, as alleged in their complaint, reflect diverse and conflicting interests within the proposed class of Ford dealers. Some dealers benefitted from the BOP, while others were harmed. For example, plaintiffs allege that certified dealers (including, for at least some periods of time, Augusta, Concord, Condon, Danvers, Fette, Midway, and Senator) were eligible to receive reimbursement of a percentage of the MSRP (which could offset the 1% assessment) as well as additional benefits, while others (including Fullers and Tilton) were not. Plaintiffs allege further that some dealers (such as Condon, Fullers, and Tilton) lost sales to other certified dealers.

With respect to plaintiffs' Robinson-Patman Act claims in particular (which appear to be the principal claims), this diversity and conflict within the proposed class defeat the requirements for class certification. "Rule 23(a)(2) requires that 'there are questions of law or fact common to the class.'" *Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 626 (3d Cir. 1996), *aff'd sub nom Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997). However, where an action is to proceed under Rule 23(b)(3), the commonality requirement "is subsumed by the predominance requirement." *Id.* at 627. Under Rule 23(b)(3), "[i]ssues common to the class must predominate over individual issues . . . ." *In re Prudential Ins. Co. of Am. Sales Practice Litigation Agent Actions*, 148 F.3d 283, 313-14 (3d Cir. 1998). The predominance requirement "tests whether the class is sufficiently cohesive to warrant adjudication by representation, and mandates that it is far more demanding than the Rule

16

23(a)(2) commonality requirement." *In re LifeUSA Holding Inc.*, 242 F.3d at 144.

The rules and requirements of the BOP, standing alone, may, as plaintiffs allege and as the District Court found, reflect a common course of conduct. However, this action involves many non-common issues based on Ford's conduct in implementing the BOP and each proposed class member's treatment under the BOP. Such individualized issues include, for example, whether the dealer was certified; during what time period the dealer was certified; whether the dealer incurred expenses in attempting to obtain certification; whether the dealer received reimbursement as a result of certification; whether other dealers in the same market were treated differently under the BOP; and whether Ford's conduct vis-a-vis a particular dealer violated the dealer's state's franchise laws. These non-common issues overtake any common issues so that as a result the latter do not predominate.

Even plaintiffs acknowledge that, as implemented, the BOP impacted individual dealers differently. Although plaintiffs allege that all Ford dealers expended money in attempting to obtain certification or re-certification, they also allege that some Ford dealers were much closer to their VOC target, and therefore had an easier time than others in obtaining certification. Moreover, with respect to discrimination in pricing or the provision of services – the conduct that the Robinson-Patman Act is designed to prevent – some members of the proposed class were in fact "favored" purchasers who benefitted from the alleged discrimination. Some Ford dealers apparently gained sales from other non-certified dealers, as a

17

result of the Program. Conversely, some members of the proposed class (and even within the group of named plaintiffs) lost sales to other, certified dealers and did not receive the benefits of certification. These dealers, those who were certified and those who were not, those who might have gained sales and those who might have lost sales, are in very different positions with respect to their Robinson-Patman Act claims.[3] Indeed, plaintiffs repeatedly allege that "the dealers who cannot compete face the constructive termination of their franchises."

The individualized and diverse issues suggested by plaintiffs' Robinson-Patman Act claims also subsume any commonality with respect to their other claims. Even assuming that the Automobile Dealer's Day in Court Act, breach of

---

[3] In concluding that the predominance requirement is satisfied, the District Court reasoned that, because plaintiffs are entitled to an inference of injury under the test established by the Supreme Court in *FTC v. Morton Salt Co.*, 334 U.S. 37, 49-51 (1948), the fact that plaintiffs must show actual competitive injury does not defeat predominance. *See Volvo Trucks North America, Inc. v. Reese-Simco GMC, Inc.*, 546 U.S. 164, 177 (2006) ("[A] permissible inference of competitive injury may arise from evidence that a favored competitor received a significant price reduction over a substantial period of time."). Even allowing the inference, common issues do not predominate. Plaintiffs' allegations themselves, as detailed in the complaint, present numerous individualized issues that will have to be resolved, including whether and which particular dealers benefitted under the BOP.

18

contract, and breach of the covenant of good faith and fair dealing claims are all based on a single franchise agreement and single course of conduct, we cannot ignore the non-common issues that would require consideration in order to resolve plaintiffs' claims. For example, some plaintiffs were reportedly directly threatened with termination, and others suffered from an underallocation of vehicles. With respect to plaintiffs' claims for violations of state franchise laws, determining Ford's liability under these laws will require a state-by-state adjudication, based on the law of each state and the facts of the dealers located in that state. On these facts, we cannot say that any common issues of law or fact predominate.

Having determined that commonality and predominance are lacking, we need not address at length the remaining requirements of Rule 23, as failure to meet any one of them precludes class certification. *In re LifeUSA Holding Inc.*, 242 F.3d at 147. However, the diversity of interests and issues that defeat the commonality and predominance requirements compel the conclusion that the superiority requirement is likewise not met.

The superiority inquiry requires us to "balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication." *Georgine*, 83 F.3d at 632 (internal quotations omitted). There are four nonexclusive factors that we should consider under the provisions of Rule 23(b)(3): (1) the interest of individual members of the class in controlling the prosecution of the action, (2) the extent of litigation commenced elsewhere by class members, (3) the desirability of concentrating claims in a given

19

forum, and (4) the management difficulties likely to be encountered in pursuing the class action.

The fourth factor counsels strongly against finding that a class action would be superior in this case. The multitude of individualized issues presented in plaintiffs' claims would entail complicated mini-litigations within the class action itself. On these facts, it would be neither more fair nor more efficient to proceed with this matter as a class action.

Nor can the proposed class satisfy the Rule 23 requirements of typicality and adequacy of representation. The typicality and adequacy inquiries "both look to the potential for conflicts in the class." *Georgine*, 83 F.3d at 632. "The [typicality] inquiry assesses whether the named plaintiffs have incentives that align with those of absent class members so that the absentees' interest will be fairly represented." *Id.* at 631. Factual differences will not defeat typicality *if* the named plaintiffs' claims arise from the same event or course of conduct that gives rise to the claims of the class members and are based on the same legal theory. *Beck*, 457 F.3d at 296. Similarly, the adequacy inquiry "assures that the named plaintiffs' claims are not antagonistic to the class and that the attorneys for the class representatives are experienced and qualified to prosecute the claims on behalf of the entire class." *Id.*

Plaintiffs' own allegations make clear that their claims, although ostensibly all arising from the Blue Oval Program, are rooted in a variety of actions Ford took pursuant to the BOP. Ford is alleged, among other things, to have denied certification to some plaintiffs, awarded certification to others, set higher

20

VOC targets for some plaintiffs than for others, assisted some dealers in obtaining certification while abandoning others, and underallocating vehicles to certain dealers.

The fact that named plaintiffs include among their ranks both certified and non-certified dealers increases the atypicality of their claims. *See Georgine*, 83 F.3d at 632. As reflected by the allegations of just the named plaintiffs, the postures of each Ford dealer and proposed class member with respect to the BOP are quite diverse. It follows that proposed class members will likely need to pursue different, and possibly conflicting, legal theories to succeed. Again, for example, some members of the proposed class received benefits under the BOP, while others did not; some had to comply with directives set by the independent contractor, and others did not. The wide range of interests among members of the proposed class precludes a finding of typicality or adequacy in this case.

## IV. <u>Conclusion</u>

For the reasons stated above, we conclude that the prerequisites of class certification set forth in Rule 23 are not satisfied in this case. Accordingly, we will vacate the District Court's order granting class certification and remand the case to the District Court for decertification of the class and further proceedings consistent with this opinion.

———

21